

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-9-1994

# Seklua v. FDIC, Inc.

Precedential or Non-Precedential:

Docket 93-3596

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"Seklua v. FDIC, Inc." (1994). *1994 Decisions.* Paper 180.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/180

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 93-3596
_____


RAYMOND SEKULA and L. KATHLEEN SEKULA

v.

FEDERAL DEPOSIT INSURANCE CORPORATION;
RESOLUTION TRUST CORPORATION

                          Raymond F. Sekula and
                          L. Kathleen Sekula,
                                    Appellants

_____

On Appeal from the United States District Court
   for the Western District of Pennsylvania
      (D.C. Civil Action No. 93-cv-00073)
            _____


         Argued June 1, 1994

Before:  SCIRICA, NYGAARD and ALDISERT, <u>Circuit</u> <u>Judges</u>

         (Filed November 9, 1994)


                    S. MICHAEL STREIB, ESQUIRE (Argued)
                    Grant Building, Suite 230
                    Pittsburgh, Pennsylvania 15219

                    Attorney for Appellants


                    Z. SCOTT BIRDWELL, ESQUIRE (Argued)
                    Federal Deposit Insurance Corporation
                    550 17th Street, N.W.
                    Washington, D.C. 20429

                    Attorney for Appellee,
                    Federal Deposit Insurance Corporation

PATRICIA A. TRUJILLO, ESQUIRE
Saul, Ewing, Remick & Saul
3800 Centre Square West
Philadelphia, Pennsylvania 19102

MITCHELL PLAVE, ESQUIRE
Resolution Trust Corporation
550 17th Street, N.W.
Washington, D.C. 20429

> Attorneys for Appellee,
> Resolution Trust Corporation

_____

OPINION OF THE COURT
_____

SCIRICA, Circuit Judge.

This is a dispute over the interpretation of a
regulation governing the amount of insurance coverage provided
for federally insured joint accounts in a failed savings and loan
association. At issue is whether the funds in joint accounts are
insured as a single unit or as multiple units and, specifically,
whether the two holders of several joint accounts are insured for
up to $100,000 or for up to $200,000. Plaintiffs, Raymond and
Kathleen Sekula, contend the regulation provides that each of
them is insured for up to $100,000 for funds held in their joint
accounts and that together they are insured for up to $200,000.
Defendants, the Federal Deposit Insurance Corporation ("FDIC")
and the Resolution Trust Corporation ("RTC"), maintain the
regulation limits the insurance to an aggregated $100,000
maximum. The district court agreed with the FDIC/RTC (hereafter

RTC), and granted summary judgment to the agency.[1]  The Sekulas

appealed.  We will affirm the district court.

I.

---

[1].  The district court granted summary judgment to the RTC, holding that five of the Sekulas' six accounts should be aggregated and insured to a total of $100,000.  The court denied summary judgment with respect to the sixth account, a certificate of deposit, directing the appellees to hold a hearing as to the ownership of that account.  Disposition of that dispute is not relevant to our interpretation of the regulation.

On November 15, 1991, the Office of Thrift Supervision declared Atlantic Financial Savings, F.A. insolvent and appointed the RTC as receiver. The RTC has the responsibility for resolving the financial affairs of failed savings and loan institutions. 12 U.S.C. § 1441a(b)(3) (Supp. V 1993). In carrying out its duties, the RTC has the same powers the FDIC has under the Federal Deposit Insurance Act ("the Act"), 12 U.S.C. § 1821 (Supp. V 1993).[2] It can approve or reject claims for insured deposits and determine the amount of insurance to which depositors are entitled under the Act. Under that authority, the RTC identified the eligible insured accounts at Atlantic Financial on the date it failed and paid insurance on what it calculated to be the insured portion of the accounts.

The Sekulas held six accounts at Atlantic Financial when the institution was declared insolvent. Each contained a signature card designated in the name of "Raymond F. Sekula or L.

---

[2]. Congress enacted the Financial Institutions Reform and Recovery Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 (1989) (codified at various locations in 12 U.S.C.) as a response to the crisis in the savings and loan industry that drew so much public attention in recent years. It was designed to improve the existing regulatory scheme and one of its purposes was to establish a new corporation, the RTC, to contain, manage, and resolve failed savings associations. The RTC in large part took over the former role of the FDIC which, in turn, took on new duties, including the functions of the Federal Savings and Loan Deposit Insurance Corporation, which was ended. See Rosa v. Resolution Trust Corp., 938 F.2d 383, 388 (3d Cir.), cert. denied, 112 S. Ct. 582 (1991); 1 Gregory Pulles et al., Firrea, Introduction (Supp. 1993). At oral argument, counsel for appellees stated that the RTC and the FDIC spoke with one voice on the issues in this case.

Kathleen Sekula" or "L. Kathleen Sekula or Raymond F. Sekula."
No other persons had ownership interests in the accounts. The
total amount in the six accounts was $169,717.52, distributed as
follows:

| Number | Balance |
|---|---|
| 00000132006597 | $ 2,015.48 |
| 00000357968841 | 32,691.51 |
| 00000354131716 | 12,147.83 |
| 00000357236116 | 15,174.67 |
| 00000357658160 | 50,105.82 |
| 90000356560995 | 57,582.21 |
| Total | 169,717.52 |

The RTC maintained that only $100,000 of the total $169,717.52
was insured, and that Raymond and Kathleen were therefore
entitled to $100,000 in the aggregate, which it paid them. The
Sekulas contended the entire amount was insured because they each
were entitled to receive up to $100,000 for their loss from the
insured accounts -- up to an aggregate of $200,000.[3]

II.

On the date Atlantic Financial was declared insolvent,
the relevant statute on aggregating deposits provided:

_____

[3]. The RTC initially treated all six accounts as joint accounts,
although the Sekulas claimed two of the accounts were actually
single ownership accounts, one belonging to Raymond Sekula and
one to Kathleen Sekula. They contended those two accounts should
have been insured separately for up to $100,000 each. The matter
was unresolved at the time of appeal, but a hearing had been
scheduled. At oral argument, counsel for the Sekulas informed
the court that the amount in dispute in this appeal had been
reduced to $13,000 as a result of the hearing. We shall proceed,
however, as if all the accounts were joint accounts; the amount
in dispute does not affect our interpretation of the regulation.

> [I]n determining the amount due to any
> depositor there shall be added together all
> deposits in the depository institution
> maintained in the same capacity and the same
> right for his benefit either in his own name
> or in the names of others . . . .

12 U.S.C. § 1813(m)(1) (1988).[4] Congress gave the FDIC the power to promulgate regulations governing the determination of net amounts due to depositors for deposits in insured depository institutions:

> For the purpose of clarifying and defining
> the insurance coverage under this subsection
> and subsection (i) of section 1817 . . . the
> [FDIC] is authorized to define, with such
> classifications and exceptions as it may
> prescribe, terms used in those subsections .
> . . and the extent of insurance coverage
> resulting therefrom.

12 U.S.C. § 1813(m)(1) (1988). Accordingly, Congress delegated authority to the FDIC (and its successor the RTC) to define the Act in promulgating the regulations and to apply them. The RTC's determination of the Sekulas' deposit insurance coverage is

---

[4]. The current version of the Federal Deposit Insurance Act provides:

> For the purpose of determining the net
> amount due to any depositor under [12 U.S.C.
> § 1821(a)(1)(B)], the Corporation shall
> aggregate the amounts of all deposits in the
> insured depository institution which are
> maintained by a depositor in the same
> capacity and the same right for the benefit
> of the depositor . . . .

12 U.S.C. § 1821(a)(1)(C) (Supp. V 1993).

governed by those regulations promulgated by the FDIC pursuant to 12 U.S.C. § 1813(m)(1) (1988)[5] and set forth in 12 C.F.R. Part 330.

The regulation in question, 12 C.F.R. § 330.7(b) (1991), directs how insurance is to be calculated for joint accounts.  It provides:

> (b) <u>Determination of insurance coverage.</u>  All qualifying joint accounts owned by the same combination of individuals shall first be added together and insured up to $100,000 in the aggregate.  The interests of each co-owner in all qualifying joint accounts, whether owned by the same or different combinations of persons, shall then be added together and the total shall be insured up to $100,000.

12 C.F.R. § 330.7(b) (1991).[6]  The RTC interpreted this regulation to limit the Sekulas' insured aggregate to $100,000.

---

[5]  The Sekulas suggest that because this statute has been changed, the RTC's interpretation is entitled to no deference, but they do not say why and cite no authority.  As the district court noted, the 1991 FDIC Improvement Act substantially reenacted the statutory scheme regarding the aggregation of a depositor's accounts for determining the net amount of insurance due each depositor.  12 U.S.C. § 1821(a)(1) (as amended 1991).  We see no substantial change in the relevant statutory provisions.

[6]  Subsection (a) of 12 C.F.R. § 330.7 describes the insurance coverage for qualifying joint accounts separately from that for individually held accounts.  Subsection (c) discusses how accounts qualify, and (d) describes how joint accounts are treated if they do not qualify.  Finally, subsection (e) deems the interests of co-owners of joint accounts to be equal unless otherwise stated in the insured depository institution's deposit account records.

The wording of the current edition of 12 C.F.R. § 330.7 is identical to that of the 1991 edition.

The Sekulas raise two principal issues on appeal. First, they contend the proper interpretation of the language of the regulation provides each of them up to $100,000 insurance coverage on their jointly held accounts -- and, consequently, that the entire amount on deposit in their joint accounts was insured. Second, they claim the RTC's interpretation of the regulation constitutes substantive rule-making and is invalid because it was not promulgated in accordance with the Administrative Procedures Act, 5 U.S.C. § 553(b) and (c) (1988). They also claim that promulgation of an alleged substantive change affecting their rights without affording them notice and an opportunity for comment as required by the APA denied them due process of law.

Neither in their notice of appeal nor in their brief have the Sekulas explicitly contested the RTC's interpretation of the statute requiring aggregation of deposits. What the Sekulas have expressly challenged is the fidelity of the RTC's method of calculation to the language of its regulation. Nevertheless, it is apparent from the thrust of their argument that they also implicitly challenge the RTC's implementation of its statutory directive.

III.

A.  Review of Agency's Regulation.

When reviewing an agency's construction of a statute, if the intent of Congress is clear, then we must give effect to

that intent.  Chevron, U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984).  If the statute is silent or ambiguous with respect to a specific issue, then a deference standard applies, and the question for the court becomes whether the agency's answer is based on a reasonable construction of the statute.  Chevron, 467 U.S. at 843.  In determining whether an agency's regulation complies with its congressional mandate, we look to see whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose.  National Muffler Dealers Ass'n v. United States, 440 U.S. 472, 477 (1979).  So long as the regulation bears a fair relationship to the language of the statute, reflects the views of those who sought its enactment, and matches the purpose they articulated, it will merit deference.  National Muffler Dealers, 440 U.S. at 484.

The statute, 12 U.S.C. § 1813(m)(1), does not explicitly provide that joint deposit account holders are to be treated and limited as a single depositor.  Accordingly, we must examine whether the agency's regulation, and its interpretation, comport with the general congressional directive.  Because congressional intent to aggregate jointly held deposits and limit insurance of that aggregate is apparent from the legislative history behind the enactment, the RTC's interpretation is based on a reasonable construction of the statute.[7]

_____

[7].  Although we believe the intent of Congress is clear, it also is true that Congress has not spoken to "the precise question at

12 U.S.C. § 1813(m)(1) directs the RTC to aggregate deposits:

> `insured deposit' [or] net amount due to any depositor . . . shall be determined according to such regulations as the [RTC] may prescribe, and in determining the amount due to any depositor there shall be added together all deposits in the depository institution maintained in the same capacity and the same right for his benefit either in his own name or in the names of others . . . .

12 U.S.C. § 1813(m)(1) (1988).  The legislative history behind the subsection reveals that the incorporation of section 1813(m)(1) into the statute was intended to prevent a single depositor from exceeding the statutory ceiling on insurance coverage through other means.  The notion that holders of a joint account would be insured as a single entity was integral to the deposit insurance scheme from the beginning.[8]  By the mid-1960s, however, there were significant problems with the administration of the federal bank deposit insurance program.  Depositors were becoming increasingly adept at evading the limits Congress had set on deposit insurance.[9]  Accordingly, Congress overhauled the

(..continued)
issue." Chevron, 467 U.S. at 843.  We normally grant deference to the agency's regulation where Congress has "left a gap for the agency to fill," by an express delegation of regulatory authority, Chevron 467 U.S. at 843-44.  The problem here, however, as we shall see, is that the regulation itself is ambiguous.

[8].  See K.E. Scott, Some Answers to Account Insurance Problems, 23 The Business Lawyer 493 (1968).

[9].  In one infamous case, the FSLIC discovered four husband-wife couples who had established 50 different accounts, each held by a

statute, directing the bank insurance agencies to develop regulations that:

> would enable the insuring agencies to bar the use of devices such as numerous joint accounts in various combinations . . . to obtain insurance far in excess of the limits established by Congress.

112 Cong. Rec. 26,472-73 (1966) (statement of Senator Robertson). See also 112 Cong. Rec. 25,007 (1966) (statement of Congressman Ashley) ("[T]he purpose of my amendment [subsection 1813(m)(1)] is to clarify the power of the insuring agencies to prevent the circumvention of the insurance limit by the device of multiple accounts in the same institution.")

The agency implemented its statutory directive by promulgating the regulatory scheme, establishing four categories of accounts:  single deposit, testamentary, joint, and trust accounts.  Within each of those categories, depositors' insurance coverage was capped at the statutory maximum.   The regulations provide that in the joint account category any combination of individuals holding joint accounts is subject to the statutory limit and any individual participating in joint accounts with different combinations of individuals is likewise limited by the cap.[10]

(..continued)
different combination of the eight people.  Because eight people could generate 247 different combinations of joint accounts, it would have been possible for those four couples to insure over $3.7 million by use of joint accounts.  Scott, supra, at 499.

[10].  See Scott, supra, at 504-08.

Unfortunately, the RTC's regulation is marred by a textual ambiguity. There is more than one plausible reading of the regulation -- one offered by the RTC and another by the Sekulas -- and neither is immediately evident from the words themselves. Only the RTC's reading, however, is consistent with the intent and purpose of the statute, as revealed by the text and the legislative history.

The ambiguity arises because of the phrase "the same or different combinations of persons," in the second sentence of subsection (b) of the regulation. See 12 C.F.R. § 330.7(b) (1991). According to the RTC, subsection (b) provides insurance up to the maximum of $100,000 for the aggregate of deposits of joint account holders. Thus, the second sentence of the subsection recognizes that to prevent an individual exceeding the statutory limit in the joint account category, his interests in joint accounts held with different combinations of individuals must be aggregated and the total must be capped at $100,000. The Sekulas, on the other hand, contend that the use of the word "same" in the second sentence explicitly provides insurance coverage for their individual interests in all joint accounts in which they participate.[11]

B.   Interpretation of the Regulation.

---

[11]. The Sekulas have not addressed the problems raised by the inconsistency of their reading with the statute's mandate to aggregate.

Generally, we defer to an agency's consistent interpretation of its own regulation unless it is "plainly erroneous or inconsistent with the regulation." Bowles v. Seminole Rock and Sand Co., 325 U.S. 410, 414 (1945). Nevertheless, "this deference does not permit us to defer to an `interpretation' . . . that strains `the plain and natural meaning of words . . . ." Director, Office of Workers' Compensation Programs v. Mangifest, 826 F.2d 1318, 1324 (3d Cir. 1987), and is "tempered by our duty to independently insure that the agency's interpretation comports with the language it has adopted." Director, Office of Workers' Compensation Programs v. Gardner, 882 F.2d 67, 70 (3d Cir. 1989).

The difficulty here is that the legislative regulation is ambiguous. If the regulation were clear and comported with the statutory directive, then, as a legislative rule, it would be entitled to deference. Chevron, 467 U.S. at 844. Because the regulation is unclear, however, we will look to the agency's interpretation of its regulation and ascertain whether it is compatible with the intent of Congress. We also will examine the regulation in view of the accepted standards of statutory construction.[12] In reviewing an agency's interpretation of its

---

[12]. See Chevron, 467 U.S. at 843 n.9 ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.")

ambiguously worded regulation, we grant less deference than otherwise.[13]

### 1.

In making its determination, the RTC applied its regulation as follows:  implementing the first sentence, it added all the Sekulas' qualifying joint accounts and determined that the total was $169,717.52, of which only $100,000 was insured; there was no need to apply the second sentence because the funds here were held by the same combination of persons as in step one and neither co-owner had ownership interests in joint accounts involving third parties.  There was no possibility that either of the Sekulas would exceed the statutory maximum in the joint account category.

By contrast, the Sekulas contend the proper application of the regulation is that, first, their joint accounts are totaled and insured in the amount of $100,000.  Then, the interests each of them has in all joint qualifying accounts he or

_____

[13]. We noted in International Raw Materials v. Stauffer Chemical Co., 978 F.2d 1318, 1325 n.9 (3d Cir. 1992), cert. denied, 113 S.Ct. 1588 (1993), that we had not decided whether Chevron, 467 U.S. at 843-44, which counselled judicial deference to an agency's legislative rules, overruled General Elec. Co. v. Gilbert, 429 U.S. 125, 141-42 (1976), which held that an agency's interpretive decisions demanded less judicial deference.  The distinction relates to agency interpretations which are not made in the context of legislative rule-making.  See Cass R. Sunstein, Law and Administration after Chevron, 90 Colum. L. Rev. 2071, 2093-94 (1990).  Because the agency here made an interpretation in the context of legislative rule-making, we need not decide whether the Gilbert standard survives.  Cf. Reich v. Local 30, Int'l Bhd. of Teamsters, 6 F.3d 978 (3d Cir. 1993).

she holds are totaled and each person's cumulative interests also are insured in the amount of $100,000.  The Sekulas claim this calculation recognizes that each of them has a half interest of $84,858.76 in their joint accounts (or a total of $167,717.52) and all of that amount is covered.  The problem with this approach, however, is that it requires elision of part of the regulation and ignores the plain intent of the statutory directive.

2.

The Sekulas claim to rely on the plain meaning rule in order to harvest the maximum coverage from the regulation.[14]  To reach their desired result they claim to give plain meaning to every word of the regulation's second sentence, which states, "the interests of each co-owner in all qualifying joint accounts, whether owned by the same or different combinations of persons," shall be added and insured up to $100,000.[15]  The Sekulas

_____

[14].  The plain meaning rule is the basic principle of statutory construction.  "[T]he meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, . . . the sole function of the courts is to enforce it according to its terms."  Caminetti v. United States, 242 U.S. 470, 485 (1917).  While the rule is one of statutory construction, it also has been applied to agency regulations.  See, e.g., Director, Office of Workers' Compensation Programs v. Mangifest, 826 F.2d 1318, 1324 (3d Cir. 1987); Bethlehem Steel Corp. v. Occupational Safety and Health Review Comm'n, 573 F.2d 157, 161 (3d Cir. 1978).

[15].  The interests to be totaled in this step are not explicitly identified as insured or uninsured interests, and the Sekulas contend that the word "interests" must therefore be taken to mean all the interests, without qualification, that each of them has

particularly focus on the word "same" in this sentence. According to their reading, the word "same" compels the conclusion that the individual's interest in all joint accounts is insured for $100,000 and that the RTC's interpretation ignores this word. In contrast to their rigorous reading of the second sentence, however, the Sekulas ignore the first sentence of the regulation, which requires that "all joint deposit accounts owned by the same combination of individuals" shall be aggregated and insured only up to the statutory limit.

Another fundamental rule of construction is that effect must be given to every part of a statute or regulation, so that no part will be meaningless. One must look at the entire provision, rather than seize on one part in isolation.[16]

(..continued)
in all qualifying joint accounts. The RTC contends that we must limit the interests included in the second step's calculation to those interests that would qualify for insurance under the first step. Although we believe that, in the context of the statute and of other parts of the regulations, step two does presume that the term "interests" means "insured interests," we need not rely on that factor because we agree with the RTC's interpretation on other grounds.

[16]. "Words . . . have only a communal existence; . . . the meaning of each interpenetrate[s] the other, . . ." National Labor Relations Bd. v. Federbush Co., 121 F.2d 954, 957 (2d Cir. 1941); see also King v. St. Vincent's Hosp., 112 S. Ct. 570, 574 (1991) ("the meaning of statutory language, plain or not, depends on context"); Pennsylvania Dep't of Public Welfare v. United States Dep't of Health and Human Services, 928 F.2d 1378, 1385 (3d Cir. 1991) (courts should avoid a construction that renders any provision superfluous) (citing United States v. Menasche, 348 U.S. 528, 538-39 (1955)). When possible, every word should be given effect "so that no part will be inoperative or superfluous, void or insignificant." Pennsylvania Dep't of Public Welfare, 928 F.2d at 1385 (quoting Norman J. Singer, 2A Sutherland Statutory Construction, § 46.06 (5th Ed. 1992)).

Our task is to give effect to all parts of the regulation, without trampling on the plain meaning of the words. Under the Sekulas' interpretation, the first sentence of the regulation would serve no purpose and the determination under that sentence that all joint accounts owned by them are aggregated and insured up to $100,000 would be inconsequential. According to the Sekulas, the second sentence requires the RTC to insure each of them for $100,000 for their individual interests in their joint accounts. By that reading, either the second sentence supplants insurance coverage calculated under the first sentence or it gives holders of joint accounts multiple insurance coverage on those accounts. Neither alternative is reasonable. The first alternative would collapse into one step what is clearly meant to be a two-step process under the regulation. The second alternative would violate the clear intent of the regulatory scheme: to limit the insurable interests of holders of joint accounts. We cannot find a way to give meaning to the first step of the regulation other than by limiting the application of step two to individuals who hold joint accounts with different combinations of persons.

In fact, the word "same," in the second sentence, was only inserted in the 1991 edition of the regulation. The second sentence of the prior regulation referred only to accounts owned by "different combinations of individuals."[17] The RTC points out

_____

[17]. The pre-1991 regulation, 12 C.F.R. § 330.9, which first appeared in the 1988 C.F.R., used two sub-sections to describe

the word was inserted merely to state the existing rule more clearly -- that a person's insured interests in joint accounts owned with the "same" combination of persons as in step one are, in step two, aggregated with the insured interests in any joint accounts he or she holds with different combinations of persons. The individual's insurable interest in this aggregate is likewise limited by the statutory cap. Thus, no individual may receive more than $100,000 of insurance coverage in the joint account category. Although we recognize the ambiguity the word "same" creates, we believe that the addition was a technical change that clarified the existing rule, but did not change insurance coverage.[18] We are convinced that rather than change the meaning

(..continued)
the two-step process that is described in one sub-section in the later version of the regulation. Subsections (d) and (e) state:

> (d) <u>Same combination of individuals.</u> All joint deposit accounts owned by the same combination of individuals shall first be added together and insured up to $100,000 in the aggregate.

> (e) <u>Interest of each coowner.</u> The interest of each coowner in all joint deposit accounts owned by different combinations of individuals shall then be added together and insured up to $100,000 in the aggregate.

12 C.F.R. § 330.9(d) and (e) (1990).

[18]. The RTC's interpretation was promulgated under the prior version. Thus, the Sekulas argue that the interpretation is now invalid. Because we do not believe that the addition of the word "same" changed the meaning of the regulation, we do not find that it compromises the RTC's interpretation.

of the regulation, the addition of the word "same" was meant to cause the wording of the regulation to reflect more clearly the RTC's longstanding interpretation of the way the insurance on joint accounts is to be calculated.

3.

The FDIC and RTC have consistently applied the joint account regulation in the manner they describe. Since promulgation of the regulatory scheme, the RTC and its predecessors have interpreted the regulations to require the aggregate of all accounts held jointly by the same two persons to be insured to the same extent as the aggregate of all accounts held by a single person. See Mahoney v. Federal Sav. and Loan Ins. Corp., 393 F.2d 156 (7th Cir.), cert. denied, 393 U.S. 837 (1968). Indeed, all the published cases, advisory opinions, and published examples are in accord with the RTC's interpretation and demonstrate a consistent application of the joint account regulation.

Furthermore, this interpretation is consistent with the general principle that joint accounts are considered to be owned collectively and insured as a single unit. This principle is enunciated in the regulations, at 12 C.F.R. § 330.3(a) (1991):

> The insurance coverage provided by the Act and the regulations in this part is based upon the ownership rights and capacities in which deposit accounts are maintained at insured depository institutions. All deposits in an insured depository institution which are maintained in the same right and capacity (by or for the benefit of a particular depositor or depositors) shall be

added together and insured in accordance with the regulations in this part.  Deposits maintained in different rights and capacities, as recognized under this part, shall be insured separately from each other.

Indeed, since the inception of the deposit insurance program, joint accounts have been considered to be owned collectively and insured as a single unit.[19]  Other federal courts have recognized and upheld the principle as axiomatic to the federal deposit insurance scheme.  See, e.g., Kershaw v. Resolution Trust Corp., 987 F.2d 1206, 1208-09 (5th Cir. 1993) (rejecting as unsupported by 12 C.F.R. § 330.7 argument of husband and wife jointly holding three CD's totalling more than $150,000 that regulation should be construed to insure interests of each spouse up to $100,000); Mahoney, 393 F.2d at 158 (joint accounts "constituted a single 'member' entity, so that the $10,000 maximum applied to the aggregate of the three accounts.").

We find it particularly significant that the agency's interpretation of the regulation is contained in a question-and-answer booklet they disseminated to financial institutions for

_____

[19].  See, e.g., testimony of Judge L.E. Birdzell, General Counsel for the FDIC, testifying before the House Banking and Currency Committee in 1935:  "as long as the account is in the name of the husband and wife, no matter what the amount is, it is treated as one deposit . . . ."  Hearings on the Banking Act of 1935, H.R. 5357:  A Bill to Provide for the Sound, Effective, and Uninterrupted Operation of the Banking System, and for Other Purposes, Before the Committee on Banking and Currency, House of Representatives, 74th Cong., 1st Sess. 26-27 (1935).  See also Scott, supra.

distribution to the public.[20]  The passage quoted below dates

prior to the 1991 insertion of the word "same."  It was used by

the FDIC's predecessor, the Federal Savings and Loan Insurance

Corporation, to explain a prior regulation on joint accounts, 12

C.F.R. § 564.9(d) and (e) (1987); it was used to explain the 1988

version, quoted above; and it is used today to explain the

version that appeared in the 1991 edition of the C.F.R.  The RTC

claims the booklet passage has not changed because the prior

versions of the regulation are identical in meaning to the

present version.

The passage paraphrases the steps for determining

deposit insurance for multiple joint accounts in answer to the

question "How are joint accounts insured?":

> 1. First, all joint accounts that are
> identically owned (i.e. held by the same
> combination of individuals) are added
> together and the combined total is insurable
> up to the $100,000 maximum.
>
> 2. After step one has been completed, joint
> accounts involving different combinations of
> individuals are reviewed to determine the
> amount of each person's insurable interest
> (or share) in all joint accounts.  Each
> owner's insurable interest in all joint
> accounts is added together and the total is

---

[20].  The booklet, which has appeared under various titles, including "Your Insured Deposit," answers the question "How are joint accounts insured?"  It states the two steps are applied so that "(1) no one joint account can be insured for over $100,000, (2) multiple joint accounts with identical ownership cannot be insured for over $100,000 in the aggregate, and (3) no one person's insured interest in the joint account category can exceed $100,000."  Federal Deposit Insurance Corporation, Your Insured Deposit (1993) (emphasis added).

> insured up to the $100,000 maximum. Each person's interest in a joint account is deemed equal unless otherwise stated on the deposit account records.

Federal Deposit Insurance Corporation, <u>Your Insured Deposit</u> (1993). In the booklet's example, A and B share joint accounts with each other and separately have interests in joint accounts held with other individuals. Step one regards A and B as one depositor, entitled to a maximum of $100,000 insurance on deposits held in those joint accounts. Then, in step two, A's and B's individual interests in that insured amount are broken out. These interests –– which may total $50,000 apiece –– are added to A's and B's insured interests in joint accounts held with other people. This step assures that for each individual that aggregate of insured interests may not exceed the $100,000 maximum.

As the district court found, these pamphlets were made available to the public. We agree that a person "proceeding in good faith should not be subjected to a trap brought about by an interpretation of a regulation hidden in the bosom of the agency." <u>Gardner</u>, 882 F.2d at 71 (quoting <u>Mangifest</u>, 826 F.2d at 1325). But there is no "trap" when the agency's interpretation of a regulation is public and long-standing.

4.

> We have consistently recognized that: The responsibility to promulgate clear and unambiguous standards is upon the Secretary. The test is not what he might possibly have intended, but what he said. If the language

> is faulty, the Secretary has the means and
> the obligation to amend.

Bethlehem Steel v. Occupational Safety and Health Review Comm'n, 573 F.2d 157, 161 (3d Cir. 1978); See also Mangifest, 826 F.2d at 1324. We agree the language of the regulation is ambiguous. Nevertheless, it has posed no trap for the unwary. The agency's interpretation and application have been consistent with the statute and the legislative purpose and joint account holders have not been misled about the impact of the regulation on their deposit insurance. Accordingly, because the regulation's meaning can be satisfactorily established by applying standard principles of statutory construction and by referring to the agency's interpretation, which is long-standing and consistent, we conclude that the regulation limits insurance for joint account deposits to a maximum of $100,000.[21]

IV.

A.   Rule-Making Procedures.

The Sekulas contend the agency's interpretation of 12 C.F.R. § 330.7(b) is itself a legislative or substantive rule and therefore is invalid because it was not promulgated in accordance with provisions of the APA requiring notice and an opportunity to comment, 5 U.S.C. § 553 (1988). But those procedures are

---

[21]. While the meaning of the regulation is satisfactorily established by textual analysis and the agencies' long-standing application and interpretation of it, we hope in the future the RTC will be more careful in the language it adopts in its regulations.

required only if a substantive change is proposed and do not apply to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A) (1988). Interpretive rules constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. Interpretive rules are not intended to alter legal rights, but to state the agency's view of what existing law requires. Such rules "merely clarify or explain existing law or regulations." Southern California Edison Co. v. Federal Energy Regulatory Comm'n, 770 F.2d 779, 783 (9th Cir. 1985). "If the rule in question merely clarifies or explains existing law or regulations, it will be deemed interpretive." Bailey v. Sullivan, 885 F.2d 52, 62 (3d Cir. 1989).

Section 330.7(b) was published by the FDIC pursuant to the notice and comment procedure. See 54 Fed. Reg. 52,399 (Dec. 21, 1989); 55 Fed. Reg. 20,111 (May 15, 1990). The RTC contends its interpretation of the regulation merely clarified and explained it. The Sekulas claim the regulation was so changed by the RTC's interpretation that it amounted to a new rule and that the RTC engaged in rule-making. But we have found the interpretation did not change the meaning of the regulation: rather it merely explained and clarified it. Furthermore, agency manuals, guidelines, and memoranda are interpretive rules not subject to the APA. See Creighton Omaha Regional Health Care

Corp. v. Bowen, 822 F.2d 785, 791 (8th Cir. 1987). The RTC's predecessor's publication of pamphlets describing its procedures for calculating insurance for joint accounts was clearly meant to interpret and clarify the insurance regulations, which have been applied consistently in accordance with the publications' descriptions. Because we find the RTC's interpretation of the regulation was not substantive rule-making, this claim must fail also.

B. Deprivation of Property Interest.

The Sekulas' argument that they are being deprived of a protected property interest without due process is without merit. Congress gave the agency the authority to promulgate regulations defining the scope of its insurance coverage. 12 U.S.C. § 1813(m)(1) (1988); Nimon v. Resolution Trust Corp., 975 F.2d 240, 245 (5th Cir. 1992). The agency did so and provided notice to depositors.

V.

For the foregoing reasons, we will affirm the judgment of the district court.