

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-12-1995

# Clean Ocean Action v York

Precedential or Non-Precedential:

Docket 94-5489

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Clean Ocean Action v York" (1995). *1995 Decisions*. Paper 165.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/165

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 94-5489

_____

CLEAN OCEAN ACTION, a New Jersey non-profit corporation; THE
AMERICAN LITTORAL SOCIETY, a New Jersey non-profit corporation;
THE FISHERMEN'S DOCK COOPERATIVE, INC., a New Jersey corporation;
THE UNITED FISHERMEN'S ASSOCIATION, a New York non-profit
corporation; THE CONFEDERATION OF THE ASSOCIATION OF THE ATLANTIC
CHARTERBOATS AND CAPTAINS, INC., a New York corporation

v.

COLONEL THOMAS A YORK, in his capacity as District Engineer of
the United States Army Corps of Engineers; GENERAL STANLEY T.
GENEGA, in his capacity as director of Civil Works of Army Corps
of Engineers; ARMY CORPS OF ENGINEERS, an agency of the United
States; CAROL M. BROWNER, in her capacity as Administrator of the
United States Environmental Protection Agency; ENVIRONMENTAL
PROTECTION AGENCY, an agency of the United States; PORT AUTHORITY
OF NEW YORK AND NEW JERSEY, a bi-state governmental agency;
WILLIAM J. MUSZYNSKI, in his capacity as Acting Regional
Administrator of the United States; NEW YORK SHIPPING
ASSOCIATION, INC.; CARRIERS CONTAINER COUNCIL, INC.;
INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO

Clean Ocean Action, The American Littoral Society, The
Fishermen's Dock Cooperative, The United Fishermen's Association,
and The Confederation of the Association of the Atlantic
Charterboats and Captains, Inc.

Appellants

_____

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civil Action No. 93-cv-02402)

Argued May 4, 1995
BEFORE: SLOVITER, Chief Judge, ALITO, Circuit Judge, and
SCHWARZER, Senior District Judge[*]

(Opinion Filed: June 12, 1995)

Gordon N. Litwin (argued)
Ansell, Zaro, Bennett & Grimm
60 Park Place
Newark, NJ 07102
Attorney for Appellants, Clean Ocean
Action, The American Littoral Society,
The Fishermen's Dock Cooperative, Inc.,
The United Fishermen's Association, The
Confederation of the Association of the
Atlantic Charterboats and Captains,
Coastal Advocates, The Pacific Coast
Federation of Fishermen Association, The
Coast Alliance, Cape Arago Audubon
Society, Manasota 88, The St. Simons
Island Save the Beach Association, Inc.,
and The Jersey Coast Anglers Association

Albert M. Ferlo, Jr. (argued)
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 23795
Washington, DC 20026
Attorney for Appellees, Colonel Thomas
A. York, General Stanley T. Genega, Army
Corps of Engineers, Carol M. Browner,
William J. Muszynski and United States
Environmental Protection Agency

Hugh H. Welsh
Michael D. Driscoll (argued)
Port Authority of New York & New Jersey
One Riverfront Plaza
Newark, NJ 07102
Attorneys for Appellee, Port Authority
of New York and New Jersey

*The Honorable William W Schwarzer, Senior United States
District Judge for the Northern District of California, sitting
by designation.

C. Peter Lambos
Donato Caruso (argued)
Lambos & Giardino
29 Broadway, 9th Floor
New York, New York 10006
Attorneys for Appellees, New York
Shipping Association, Inc. and Carriers
Container Council, Inc.

Thomas W. Gleason
Ernest L. Mathews, Jr.
Gleason & Mathews
26 Broadway, 17th Floor
New York, New York 10004
Attorneys for Appellee, International
Longshoremen's Association, AFL-CIO

Louis Pechman
Lambos & Giardino
17 Academy Street, Suite 305
Newark, NJ 07102
Attorney for Appellees, New York
Shipping Association, Inc. and Carriers
Container Council, Inc.

Mark H. Rochkind
Hausman & Sunberg
7 Cleveland Street
Caldwell, NJ 07006
Attorney for Appellee, International
Longshoremen's Association, AFL-CIO

Lois J. Schiffer
Assistant Attorney General
Department of Justice
Environment and Natural Resources
Division
10th and Constitution Avenue, N.W.
Washington, D.C. 20530
Attorney for Federal Appellees

David M. Gravallese
Environmental Protection Agency
401 M Street, S.W.
Washington, D.C. 20460
Attorney for Federal Appellees

Phyllis Feinmark
Office of Regional Counsel
E.P.A. Region II

New York, New York 10278
Attorney for Federal Appellees

James G. Palmer
U.S. Army Corps of Engineers
New York District
Office of the General Counsel
New York, New York 10278
Attorney for Federal Appellees

Faith S. Hochberg
United States Attorney
Office of the United States Attorney
970 Broad Street, Room 502
Newark, New Jersey 07102
Attorney for Federal Appellees

Susan Handler-Menahem
Assistant U.S. Attorney
Office of the United States Attorney
970 Broad Street, Room 502
Newark, New Jersey 07102
Attorney for Federal Appellees

Mary Elizabeth Ward
David L. Shilton
Albert M. Ferlo, Jr.
Environmental and Natural Resources
Division
Department of Justice
Post Office Box 23795
L'Enfant Plaza Station
Washington, D.C. 20026
Attorneys for Federal Appellees

---

OPINION OF THE COURT

---

SCHWARZER, District Judge.

Appellants, a group of conservation, fishing, boating, civic, realty and educational groups, brought this action against the Army Corps of Engineers (Corps), the Environmental

Protection Agency (EPA), the Port Authority of New York and New Jersey (Port Authority) and various federal officials, for declaratory and injunctive relief to stop the ocean dumping of materials dredged from the Port Authority's Newark/Port Elizabeth facility. The district court denied the application for a preliminary injunction and this appeal followed. We have appellate jurisdiction over the district court's order denying the preliminary injunction under 28 U.S.C. §1292(a)(1)(West Supp. 1994). The district court had subject matter jurisdiction of the action under 28 U.S.C. §1331 (West Supp. 1994) (federal question), 33 U.S.C. §1415(g)(West Supp. 1994)(Marine Protection, Research, and Sanctuaries Act (MPRSA)), and 5 U.S.C. §704 (West Supp. 1994) (Administrative Procedure Act).

## I.

On May 26, 1993, the Corps issued a permit allowing the Port Authority to dredge up to 500,000 cubic yards of material from its Newark/Port Elizabeth facility and dispose of the material at an ocean mud dump site six miles off the New Jersey shore. The material to be dumped contained dioxin. On June 1, 1993, appellants filed this action for declaratory and injunctive relief and sought, but were denied, a temporary restraining order against the proposed ocean dumping.

At the close of the hearing on appellants' application for a preliminary injunction on June 7, 1993, the district court, in an oral ruling, denied the application. The court found that on the record before it, there was insufficient evidence to show that defendants had complied with the detailed procedures necessary

under the EPA's ocean dumping regulations to demonstrate that dioxin was present in the materials to be dumped only as a trace contaminant with no significant undesirable effects. It concluded that the record did not support the Corps' finding that the permit met the requirements of the EPA's ocean dumping regulations and that appellants therefore were likely to succeed on the merits of their claim. The court further found, however, that the catastrophic injuries to the shipping industry, to longshoremen and other workers, and to the public at large, which would result from the failure to dredge, outweighed the minimal or non-existent injuries to plaintiffs, since the dredging under the permit would have no significant adverse environmental effects. Finally, the court stated that it was highly likely that defendants would be able to establish that dioxin was present only in trace quantities or, alternatively, obtain a waiver from the Secretary of the Army. While denying the application, the court also ordered the Port Authority either to establish that the permit was lawfully issued under the EPA's regulations or to pursue a waiver, and it ordered the Corps to issue no further permits for dumping at the dump site until compliance had been established or a waiver obtained.

Appellants did not appeal the denial of the preliminary injunction at that time, and in excess of 450,000 cubic yards has since been dumped at the site.[1] Meanwhile the Port Authority

---

[1] No party argues that the appeal should be treated as moot. Since the permit will not expire until January 1996 and has not been exhausted, we agree that the appeal is not moot.

submitted a memorandum and supporting exhibits to the court to demonstrate that the permit had been lawfully issued. In a ruling issued on July 6, 1993, the court found that defendants had failed to perform all the tests required to qualify dioxin as a trace contaminant but that it appeared likely that if all the tests were performed, dioxin in the dumped material would be classified as a trace contaminant. Accordingly, the court granted defendants until September 1, 1993 to perform additional tests and to submit a memorandum demonstrating their compliance with regulatory requirements. Defendants as well as plaintiffs submitted additional materials.

On June 28, 1994, the district court issued the opinion from which the instant appeal was taken, once again denying the request for a preliminary injunction. This time the court concluded that "the bioassays which defendants conducted met the regulatory requirements and support the conclusion that the sludge dioxin is a trace contaminant falling outside the dumping prohibition of [33 C.F.R.] §227.6(a)." It held that "reading the regulations in their entirety, . . . it is apparent that the government agencies reserved wide discretion in themselves to determine which tests should be conducted and the manner of conducting those tests."

## II.

When ruling on a motion for a preliminary injunction, the district court must consider four factors: the likelihood of success on the merits; the extent of irreparable injury from the conduct complained of; the extent of irreparable harm to the

defendants if a preliminary injunction issues; and the public interest.  Opticians Association of America v. Independent Opticians of America, 920 F.2d 187, 191-92 (3rd Cir. 1990).  In reviewing the district court's denial of a preliminary injunction, we "cannot reverse unless the trial court has committed an obvious error in applying the law or a serious mistake in considering the proof."  Freixenet, S.A. v. Admiral Wine & Liquor Co. 731 F.2d 148, 150 (3rd Cir. 1984); Opticians Association, 920 F.2d at 192.  We hold that the district court committed a serious error in applying the law with respect to the defendants' compliance with the EPA regulations but that both the balance of harms and the public interest support the denial of the preliminary injunction.

III.

The MPRSA (the Act) prohibits the dumping of materials into the ocean except as authorized by a permit issued by the EPA. 33 U.S.C. §1411 (West Supp. 1994).  Section 1412 of the Act directs the EPA to "establish and apply criteria for reviewing and evaluating . . . [ocean] permit applications."  The EPA has adopted such criteria for the evaluation of permit applications for ocean dumping of materials.  40 C.F.R. part 227 (1992)(the Regulations).  The Regulations state, in relevant part, that ocean dumping of "materials containing . . . constituents . . . suspected to be carcinogens . . . <u>as other than trace contaminants</u> . . . <u>will not be approved</u>" [other than on an emergency basis, not applicable here].  40 C.F.R. §227.6(a)(5)(all emphasis herein is added).  The Regulations establish the procedure for qualifying constituents "suspected to be carcinogens" as only trace contaminants.

First, the Regulations state the criterion for qualification as trace contaminants:

> These constituents <u>will be considered to be present as trace contaminants only</u> when they are present . . . in such forms and amounts in liquid, suspended particulate, and solid phases that the dumping of the materials will not cause significant undesirable effects, including the possibility
>
> of danger associated with their bioaccumulation in
>
> marine     organisms.

40 C.F.R. §227.6(b).  Next, the Regulations specify the procedure for determining whether the constituents qualify under the above

criterion, that is, whether the constituents have a potential for causing significant undesirable effects, as follows:

> The potential for significant undesirable effects due to the presence of these constituents <u>shall be determined by application of results of bioassays</u> on liquid, suspended      particulate, and solid phases of wastes according to procedures acceptable to EPA, and for dredged material, acceptable to EPA and the Corps of Engineers.

40 C.F.R. §227.6(c).  The Regulations then address the procedures for making that determination:  "Materials shall be deemed environmentally acceptable for ocean dumping <u>only when the following conditions are met</u>."  Id.  Two of the stated conditions are relevant here.  The first condition relates to the suspended particulate phase of the waste (i.e. the water column during the dumping) and states that "<u>bioassays shall be conducted</u> with appropriate sensitive marine organisms as defined in §227.27(c)[which defines them as pelagic organisms, i.e. those that live in the water column] using procedures . . . approved by EPA and the Corps of Engineers" to establish the absence of "significant mortality or significant adverse sublethal effects including bioaccumuluation . . ."  40 C.F.R. §227.6(c)(2).  Section 227.6(c)(2) further specifies the procedures for conducting bioassays under the section.

The second condition relates to the solid phase of the waste (i.e. the deposit on the ocean floor) and states that "<u>bioassays shall be conducted</u> with appropriate sensitive benthic marine organisms [i.e. organisms that live on the ocean floor] using

benthic bioasssay procedures . . . approved by EPA and the Corps of Engineers" to establish the absence of "significant mortality or significant adverse sublethal effects . . ." 40 C.F.R. §227.6(c)(3).

The plain meaning of these Regulations is that the dumping of materials containing dioxin is prohibited unless the dioxin is present only as a trace contaminant; that dioxin can qualify as a trace contaminant only when it will not cause significant undesirable effects; and that the determination whether dioxin will cause significant undesirable effects is to be made by conducting specified tests, including bioassays in the suspended particulate and solid phases of the waste on specified types of marine organisms. The court found and it is undisputed that no bioassays were conducted on the suspended particulate phase. It further found and it is undisputed that bioassays were performed on the solid phase of the waste with only one benthic (ocean floor) species, not with three species as required by §227.27(d).

In concluding that the agencies had reserved discretion to themselves to determine which tests to conduct, the district court relied on the language of §227.6(c), which provides: "The potential for significant undesirable effects due to the presence of these constituents shall be determined by application of results of bioasssays on liquid, suspended particulate, and solid phases of wastes <u>according to procedures acceptable to EPA, or, for dredged material, acceptable to EPA and the Corps of Engineers</u> . . . ."

The EPA's reservation of discretion to determine how to conduct tests cannot be read as a reservation of discretion to determine whether to conduct tests required by the unequivocal language of its regulations. The Regulations make a clear distinction between requiring a test and determining how to conduct it when they state that "[t]hese bioassays shall be conducted with appropriate sensitive marine organisms as defined in §227.27(c) using procedures for suspended particulate phase bioassays approved by EPA . . and the Corps . . ." §227.6(c)(2). Similar language is used in §227.6(c)(3) with respect to solid phase testing of waste.

"Generally we defer to an agency's consistent interpretation of its own regulations unless it is 'plainly erroneous or inconsistent with the regulation.'" Sekula v. FDIC, 39 F.3d 448, 453 (3rd Cir. 1994), quoting Bowles v. Seminole Rock and Sand Co. 325 U.S. 410, 414 (1945). But "this deference does not permit us to defer to an 'interpretation' . . that strains 'the plain and natural meaning of words . . .'" Id., quoting Director, Office of Workers' Compensation Programs v. Mangifest, 826 F.2d 1318, 1324 (3rd Cir. 1987). It is "our duty to independently insure that the agency's interpretation comports with the language it has adopted." Director, Office of Workers' Compensation Programs v. Gardner, 882 F.2d 67, 70 (3rd Cir. 1989).

The language of the EPA's Regulations is unambiguous. We find that the interpretation adopted by the defendants and accepted by the court is inconsistent with the plain meaning of that language. While the MPRSA gives the EPA broad rule-making

authority under which it could have reserved to itself the discretion it now claims, it simply failed to do so.  See Accardi v. Shaughnessy, 347 U.S. 260, 267–68 (1954).

Defendants contend that under the EPA's long-standing interpretation of its Regulations, it has never required bioaccumulation testing on the suspended particulate phase.  They point to the Dredged Material Testing Manual (the "Green Book"), first issued by the EPA in 1977 and again in an updated version in 1991. 55 Fed.Reg. 8191 (Mar. 7, 1990); 56 Fed.Reg. 13,826 (Apr. 4, 1991).  The 1991 Green Book states, reiterating similar text in the 1977 edition, that '[b]ioaccumulation from the material in the water column is generally of minor concern, due to the short exposure time and the low exposure concentrations, resulting from rapid dispersion and dilution." 59 Fed.Reg. 26568 (May 20, 1994). The Green Book, the court found, does not specify a suspended particulate bioaccumulation test.[2]

It appears to us that the Green Book is intended to implement the provisions of the Regulations that tests be conducted "using procedures approved by EPA and . . . the Corps." If the Green Book's omission of procedures for suspended particulate testing were read as the agency's interpretation of

---

2 Defendants do not argue, nor did the court find, that the Green Book supports their failure to comply with the requirement that three benthic species be tested with the solid phase.  What the district court found was that the test procedures followed were the most conservative and would produce results of the worst case scenario and that they established that the proposed dumping would create no significant undesirable effects.  That finding, however, does not support the court's conclusion that "the testing complied with the requirements of §227.6(c)(3)".

its Regulations, however, it could be given no force for it would be in direct conflict with those Regulations. Gardner, 882 F.2d at 70. An agency guideline or directive that conflicts with the plain meaning of a regulation is invalid. National Family Planning & Reproductive Health Ass'n v. Sullivan, 979 F.2d 227, 234–36 (D.C. Cir. 1992).

If the Green Book were read as an attempt to amend the Regulations, it would fail as well. The EPA issued the Regulations under its authority to "establish and apply criteria for reviewing and evaluating . . . [ocean dumping] permit applications." 33 U.S.C. §1412(a). An agency is bound by the express terms of its regulations until it amends or revokes them. Facchiano Const. Co., Inc. v. U.S. Dept. of Labor, 987 F.2d 206, 213 (3d Cir.), cert denied, 114 S.Ct. 80 (1993), citing United States v. Nixon, 418 U.S. 683, 695–96 (1974); see also Accardi, 347 U.S. at 266–67. Once a legislative rule such as the Regulations is adopted, its substantive provisions may be changed only by compliance with the notice and hearing requirements of the Administrative Procedure Act. 5 USC §553(b)(A)(West Supp. 1994); Sekula v. FDIC, 39 F.3d at 457.

The announcements of the 1991 edition of the Green Book did not purport to be an exercise of EPA's rule-making authority. See 55 Fed.Reg. 8191 (Mar. 7, 1990); 56 Fed.Reg. 13,826 (Apr. 4,1991). The 1991 announcement describes the Green Book as replacing the 1977 edition, which it states "provided guidance for implementing the environmental evaluations required under the ocean dumping regulations to determine the acceptability of

dredged materials for ocean dumping . . . to ensure compliance with EPA's environmental criteria." 56 Fed. Reg. at 13,827. By way of contrast, the EPA's exercise of its rule making authority is illustrated by the announcement of its interim final rule in which it adopted a clarification of the Regulations' suspended particulate phase testing provisions subsequent to the commencement of this litigation. 59 Fed.Reg. 26,566 (May 20, 1994). Thus the Green Book is merely a guidance document which cannot be given the effect of amending the Regulations.

Accordingly, we conclude that the district court's holding that defendants complied with the EPA's Regulations constitutes serious error in applying the law.

IV.

At the initial hearing on appellants' application for injunctive relief, the court found that the functioning of the port is of extraordinary economic importance to the ocean carriers and longshoremen directly affected by the curtailment and eventual cessation of activities and to the entire region which is already suffering from serious economic conditions. The catastrophic injuries to these interests and the public at large outweigh the minimal or non-existent injuries to appellants since no significant adverse environmental effects were shown to result. Appellants take no issue with these findings but contend that they are irrelevant to the controlling considerations under the MPRSA and the Regulations. The argument misses the point. The question here is not whether the Corps or the EPA may take economic considerations into account in issuing the permit but

rather whether the court's equitable power should be exercised on behalf of appellants. It is clear that the district court must weigh the balance of harms in determining whether to grant a preliminary injunction and we cannot say that in doing so here, it abused its discretion.

In light of appellants' failure to show the requisite irreparable injury, the order of the district court denying a preliminary injunction will be affirmed.