57 F.3d 328
 41 ERC 1025, 25 Envtl. L. Rep. 21,236
 CLEAN OCEAN ACTION, a New Jersey non-profit corporation;
the American Littoral Society, a New Jersey non-profit
corporation; the Fishermen's Dock Cooperative, Inc., a New
Jersey corporation; the United Fishermen's Association, a
New York non-profit corporation; the Confederation of the
Association of the Atlantic Charterboats and Captains, Inc.,
a New York corporation
v.
Colonel Thomas A. YORK, in his capacity as District Engineer
of the United States Army Corps of Engineers; General
Stanley T. Genega, in his capacity as Director of Civil
Works of Army Corps of Engineers; Army Corps of Engineers,
an agency of the United States; Carol M. Browner, in her
capacity as Administrator of the United States Environmental
Protection Agency; Environmental Protection Agency, an
agency of the United States; Port Authority of New York and
New Jersey, a bi-state governmental agency; William J.
Muszynski, in his capacity as Acting Regional Administrator
of the United States; New York Shipping Association, Inc.;
Carriers Container Council, Inc.; International
Longshoremen's Association, AFL-CIO,
Clean Ocean Action, The American Littoral Society, The
Fishermen's Dock Cooperative, The United Fishermen's
Association, and The Confederation of the Association of the
Atlantic Charterboats and Captains, Inc., Appellants.
 No. 94-5489.
 United States Court of Appeals,
Third Circuit.
 Argued May 4, 1995.
Decided June 12, 1995.
 
 1
 Gordon N. Litwin (argued), Ansell, Zaro, Bennett & Grimm, Newark, NJ, for appellants, Clean Ocean Action, The American Littoral Soc., The Fishermen's Dock Co-op., Inc., The United Fishermen's Ass'n., The Confederation of the Ass'n of the Atlantic Charterboats and Captains, Coastal Advocates, The Pacific Coast Federation of Fishermen Association, The Coast Alliance, Cape Arago Audubon Soc., Manasota 88, The St. Simons Island Save the Beach Ass'n, Inc., and The Jersey Coast Anglers Ass'n.
 
 
 2
 Albert M. Ferlo, Jr. (argued), U.S. Dept. of Justice Environment & Natural Resources Div., Washington, DC, for appellees, Colonel Thomas A. York, General Stanley T. Genega, Army Corps of Engineers, Carol M. Browner, William J. Muszynski and U.S. E.P.A.
 
 
 3
 Hugh H. Welsh, Michael D. Driscoll (argued), Port Authority of New York & New Jersey, Newark, NJ, for appellee, Port Authority of New York and New Jersey.
 
 
 4
 C. Peter Lambos, Donato Caruso (argued), Lambos & Giardino, New York City, for appellees, New York Shipping Ass'n, Inc. and Carriers Container Council, Inc.
 
 
 5
 Thomas W. Gleason, Ernest L. Mathews, Jr., Gleason & Mathews, New York City, for appellee, Intern. Longshoremen's Ass'n, AFL-CIO.
 
 
 6
 Louis Pechman, Lambos & Giardino, Newark, NJ, for appellees, New York Shipping Ass'n, Inc. and Carriers Container Council, Inc.
 
 
 7
 Mark H. Rochkind, Hausman & Sunberg, Caldwell, NJ, for appellee, Intern. Longshoremen's Ass'n, AFL-CIO.
 
 
 8
 Lois J. Schiffer, Asst. Atty. Gen., Dept. of Justice, Environment and Natural Resources Div., David M. Gravallese, E.P.A., Washington, DC, Phyllis Feinmark, Office of Regional Counsel, E.P.A. Region II, James G. Palmer, U.S. Army Corps of Engineers, New York Dist., Office of the Gen. Counsel, New York City, Faith S. Hochberg, U.S. Atty., Susan Handler-Menahem, Asst. U.S. Atty., Newark, NJ, Mary Elizabeth Ward, David L. Shilton, Albert M. Ferlo, Jr., Environment and Natural Resources Div., Dept. of Justice, Washington, DC, for Federal appellees.
 
 
 9
 Before: SLOVITER, Chief Judge, ALITO, Circuit Judge, and SCHWARZER, Senior District Judge*.
 
 OPINION OF THE COURT
 
 10
 SCHWARZER, Senior District Judge.
 
 
 11
 Appellants, a group of conservation, fishing, boating, civic, realty and educational groups, brought this action against the Army Corps of Engineers (Corps), the Environmental Protection Agency (EPA), the Port Authority of New York and New Jersey (Port Authority) and various federal officials, for declaratory and injunctive relief to stop the ocean dumping of materials dredged from the Port Authority's Newark/Port Elizabeth facility. The district court denied the application for a preliminary injunction and this appeal followed. We have appellate jurisdiction over the district court's order denying the preliminary injunction under 28 U.S.C. Sec. 1292(a)(1) (West Supp.1994). The district court had subject matter jurisdiction of the action under 28 U.S.C. Sec. 1331 (West Supp.1994) (federal question), 33 U.S.C. Sec. 1415(g) (West Supp.1994) (Marine Protection, Research, and Sanctuaries Act (MPRSA)), and 5 U.S.C. Sec. 704 (West Supp.1994) (Administrative Procedure Act).
 
 I.
 
 12
 On May 26, 1993, the Corps issued a permit allowing the Port Authority to dredge up to 500,000 cubic yards of material from its Newark/Port Elizabeth facility and dispose of the material at an ocean mud dump site six miles off the New Jersey shore. The material to be dumped contained dioxin. On June 1, 1993, appellants filed this action for declaratory and injunctive relief and sought, but were denied, a temporary restraining order against the proposed ocean dumping.
 
 
 13
 At the close of the hearing on appellants' application for a preliminary injunction on June 7, 1993, the district court, in an oral ruling, denied the application. The court found that on the record before it, there was insufficient evidence to show that defendants had complied with the detailed procedures necessary under the EPA's ocean dumping regulations to demonstrate that dioxin was present in the materials to be dumped only as a trace contaminant with no significant undesirable effects. It concluded that the record did not support the Corps' finding that the permit met the requirements of the EPA's ocean dumping regulations and that appellants therefore were likely to succeed on the merits of their claim. The court further found, however, that the catastrophic injuries to the shipping industry, to longshoremen and other workers, and to the public at large, which would result from the failure to dredge, outweighed the minimal or non-existent injuries to plaintiffs, since the dredging under the permit would have no significant adverse environmental effects. Finally, the court stated that it was highly likely that defendants would be able to establish that dioxin was present only in trace quantities or, alternatively, obtain a waiver from the Secretary of the Army. While denying the application, the court also ordered the Port Authority either to establish that the permit was lawfully issued under the EPA's regulations or to pursue a waiver, and it ordered the Corps to issue no further permits for dumping at the dump site until compliance had been established or a waiver obtained.
 
 
 14
 Appellants did not appeal the denial of the preliminary injunction at that time, and in excess of 450,000 cubic yards has since been dumped at the site.[1] Meanwhile the Port Authority submitted a memorandum and supporting exhibits to the court to demonstrate that the permit had been lawfully issued. In a ruling issued on July 6, 1993, the court found that defendants had failed to perform all the tests required to qualify dioxin as a trace contaminant but that it appeared likely that if all the tests were performed, dioxin in the dumped material would be classified as a trace contaminant. Accordingly, the court granted defendants until September 1, 1993 to perform additional tests and to submit a memorandum demonstrating their compliance with regulatory requirements. Defendants as well as plaintiffs submitted additional materials.
 
 
 15
 On June 28, 1994, the district court issued the opinion from which the instant appeal was taken, once again denying the request for a preliminary injunction. This time the court concluded that "the bioassays which defendants conducted met the regulatory requirements and support the conclusion that the sludge dioxin is a trace contaminant falling outside the dumping prohibition of [33 C.F.R.] Sec. 227.6(a)." It held that "reading the regulations in their entirety, ... it is apparent that the government agencies reserved wide discretion in themselves to determine which tests should be conducted and the manner of conducting those tests."
 
 II.
 
 16
 When ruling on a motion for a preliminary injunction, the district court must consider four factors: the likelihood of success on the merits; the extent of irreparable injury from the conduct complained of; the extent of irreparable harm to the defendants if a preliminary injunction issues; and the public interest. Opticians Association of America v. Independent Opticians of America, 920 F.2d 187, 191-92 (3rd Cir.1990). In reviewing the district court's denial of a preliminary injunction, we "cannot reverse unless the trial court has committed an obvious error in applying the law or a serious mistake in considering the proof." Freixenet, S.A. v. Admiral Wine & Liquor Co. 731 F.2d 148, 150 (3rd Cir.1984); Opticians Association, 920 F.2d at 192. We hold that the district court committed a serious error in applying the law with respect to the defendants' compliance with the EPA regulations but that both the balance of harms and the public interest support the denial of the preliminary injunction.
 
 III.
 
 17
 The MPRSA (the Act) prohibits the dumping of materials into the ocean except as authorized by a permit issued by the EPA. 33 U.S.C. Sec. 1411 (West Supp.1994). Section 1412 of the Act directs the EPA to "establish and apply criteria for reviewing and evaluating ... [ocean] permit applications." The EPA has adopted such criteria for the evaluation of permit applications for ocean dumping of materials. 40 C.F.R. part 227 (1992) (the Regulations). The Regulations state, in relevant part, that ocean dumping of "materials containing ... constituents ... suspected to be carcinogens ... as other than trace contaminants ... will not be approved" [other than on an emergency basis, not applicable here]. 40 C.F.R. Sec. 227.6(a)(5) (all emphasis herein is added). The Regulations establish the procedure for qualifying constituents "suspected to be carcinogens" as only trace contaminants.
 
 
 18
 First, the Regulations state the criterion for qualification as trace contaminants:
 
 
 19
 These constituents will be considered to be present as trace contaminants only when they are present ... in such forms and amounts in liquid, suspended particulate, and solid phases that the dumping of the materials will not cause significant undesirable effects, including the possibility of danger associated with their bioaccumulation in marine organisms.
 
 
 20
 40 C.F.R. Sec. 227.6(b). Next, the Regulations specify the procedure for determining whether the constituents qualify under the above criterion, that is, whether the constituents have a potential for causing significant undesirable effects, as follows:
 
 
 21
 The potential for significant undesirable effects due to the presence of these constituents shall be determined by application of results of bioassays on liquid, suspended particulate, and solid phases of wastes according to procedures acceptable to EPA, and for dredged material, acceptable to EPA and the Corps of Engineers.
 
 
 22
 40 C.F.R. Sec. 227.6(c). The Regulations then address the procedures for making that determination: "Materials shall be deemed environmentally acceptable for ocean dumping only when the following conditions are met." Id. Two of the stated conditions are relevant here. The first condition relates to the suspended particulate phase of the waste (i.e. the water column during the dumping) and states that "bioassays shall be conducted with appropriate sensitive marine organisms as defined in Sec. 227.27(c) [which defines them as pelagic organisms, i.e. those that live in the water column] using procedures ... approved by EPA and the Corps of Engineers" to establish the absence of "significant mortality or significant adverse sublethal effects including bioaccumulation ..." 40 C.F.R. Sec. 227.6(c)(2). Section 227.6(c)(2) further specifies the procedures for conducting bioassays under the section.
 
 
 23
 The second condition relates to the solid phase of the waste (i.e. the deposit on the ocean floor) and states that "bioassays shall be conducted with appropriate sensitive benthic marine organisms [i.e. organisms that live on the ocean floor] using benthic bioassay procedures ... approved by EPA and the Corps of Engineers" to establish the absence of "significant mortality or significant adverse sublethal effects ..." 40 C.F.R. Sec. 227.6(c)(3).
 
 
 24
 The plain meaning of these Regulations is that the dumping of materials containing dioxin is prohibited unless the dioxin is present only as a trace contaminant; that dioxin can qualify as a trace contaminant only when it will not cause significant undesirable effects; and that the determination whether dioxin will cause significant undesirable effects is to be made by conducting specified tests, including bioassays in the suspended particulate and solid phases of the waste on specified types of marine organisms. The court found and it is undisputed that no bioassays were conducted on the suspended particulate phase. It further found and it is undisputed that bioassays were performed on the solid phase of the waste with only one benthic (ocean floor) species, not with three species as required by Sec. 227.27(d).
 
 
 25
 In concluding that the agencies had reserved discretion to themselves to determine which tests to conduct, the district court relied on the language of Sec. 227.6(c), which provides: "The potential for significant undesirable effects due to the presence of these constituents shall be determined by application of results of bioassays on liquid, suspended particulate, and solid phases of wastes according to procedures acceptable to EPA, or, for dredged material, acceptable to EPA and the Corps of Engineers ..."
 
 
 26
 The EPA's reservation of discretion to determine how to conduct tests cannot be read as a reservation of discretion to determine whether to conduct tests required by the unequivocal language of its regulations. The Regulations make a clear distinction between requiring a test and determining how to conduct it when they state that "[t]hese bioassays shall be conducted with appropriate sensitive marine organisms as defined in Sec. 227.27(c) using procedures for suspended particulate phase bioassays approved by EPA ... and the Corps ..." Sec. 227.6(c)(2). Similar language is used in Sec. 227.6(c)(3) with respect to solid phase testing of waste.
 
 
 27
 "Generally we defer to an agency's consistent interpretation of its own regulations unless it is 'plainly erroneous or inconsistent with the regulation.' " Sekula v. FDIC, 39 F.3d 448, 453 (3rd Cir.1994), quoting Bowles v. Seminole Rock and Sand Co. 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). But "this deference does not permit us to defer to an 'interpretation' ... that strains 'the plain and natural meaning of words ...' " Id., quoting Director, Office of Workers' Compensation Programs v. Mangifest, 826 F.2d 1318, 1324 (3rd Cir.1987). It is "our duty to independently insure that the agency's interpretation comports with the language it has adopted." Director, Office of Workers' Compensation Programs v. Gardner, 882 F.2d 67, 70 (3rd Cir.1989).
 
 
 28
 The language of the EPA's Regulations is unambiguous. We find that the interpretation adopted by the defendants and accepted by the court is inconsistent with the plain meaning of that language. While the MPRSA gives the EPA broad rule-making authority under which it could have reserved to itself the discretion it now claims, it simply failed to do so. See Accardi v. Shaughnessy, 347 U.S. 260, 267-68, 74 S.Ct. 499, 503-04, 98 L.Ed. 681 (1954).
 
 
 29
 Defendants contend that under the EPA's long-standing interpretation of its Regulations, it has never required bioaccumulation testing on the suspended particulate phase. They point to the Dredged Material Testing Manual (the "Green Book"), first issued by the EPA in 1977 and again in an updated version in 1991. 55 Fed.Reg. 8191 (Mar. 7, 1990); 56 Fed.Reg. 13,826 (Apr. 4, 1991). The 1991 Green Book states, reiterating similar text in the 1977 edition, that "[b]ioaccumulation from the material in the water column is generally of minor concern, due to the short exposure time and the low exposure concentrations, resulting from rapid dispersion and dilution." 59 Fed.Reg. 26568 (May 20, 1994). The Green Book, the court found, does not specify a suspended particulate bioaccumulation test.[2]
 
 
 30
 It appears to us that the Green Book is intended to implement the provisions of the Regulations that tests be conducted "using procedures approved by EPA and ... the Corps." If the Green Book's omission of procedures for suspended particulate testing were read as the agency's interpretation of its Regulations, however, it could be given no force for it would be in direct conflict with those Regulations. Gardner, 882 F.2d at 70. An agency guideline or directive that conflicts with the plain meaning of a regulation is invalid. National Family Planning & Reproductive Health Ass'n v. Sullivan, 979 F.2d 227, 234-36 (D.C.Cir.1992).
 
 
 31
 If the Green Book were read as an attempt to amend the Regulations, it would fail as well. The EPA issued the Regulations under its authority to "establish and apply criteria for reviewing and evaluating ... [ocean dumping] permit applications." 33 U.S.C. Sec. 1412(a). An agency is bound by the express terms of its regulations until it amends or revokes them. Facchiano Const. Co., Inc. v. U.S. Dept. of Labor, 987 F.2d 206, 213 (3d Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 80, 126 L.Ed.2d 48 (1993), citing United States v. Nixon, 418 U.S. 683, 695-96, 94 S.Ct. 3090, 3101-02, 41 L.Ed.2d 1039 (1974); see also Accardi, 347 U.S. at 266-67, 74 S.Ct. at 502-03. Once a legislative rule such as the Regulations is adopted, its substantive provisions may be changed only by compliance with the notice and hearing requirements of the Administrative Procedure Act. 5 U.S.C. Sec. 553(b)(A) (West Supp.1994); Sekula v. FDIC, 39 F.3d at 457.
 
 
 32
 The announcements of the 1991 edition of the Green Book did not purport to be an exercise of EPA's rule-making authority. See 55 Fed.Reg. 8191 (Mar. 7, 1990); 56 Fed.Reg. 13,826 (Apr. 4, 1991). The 1991 announcement describes the Green Book as replacing the 1977 edition, which it states "provided guidance for implementing the environmental evaluations required under the ocean dumping regulations to determine the acceptability of dredged materials for ocean dumping ... to ensure compliance with EPA's environmental criteria." 56 Fed.Reg. at 13,827. By way of contrast, the EPA's exercise of its rule making authority is illustrated by the announcement of its interim final rule in which it adopted a clarification of the Regulations' suspended particulate phase testing provisions subsequent to the commencement of this litigation. 59 Fed.Reg. 26,566 (May 20, 1994). Thus the Green Book is merely a guidance document which cannot be given the effect of amending the Regulations.
 
 
 33
 Accordingly, we conclude that the district court's holding that defendants complied with the EPA's Regulations constitutes serious error in applying the law.
 
 IV.
 
 34
 At the initial hearing on appellants' application for injunctive relief, the court found that the functioning of the port is of extraordinary economic importance to the ocean carriers and longshoremen directly affected by the curtailment and eventual cessation of activities and to the entire region which is already suffering from serious economic conditions. The catastrophic injuries to these interests and the public at large outweigh the minimal or non-existent injuries to appellants since no significant adverse environmental effects were shown to result. Appellants take no issue with these findings but contend that they are irrelevant to the controlling considerations under the MPRSA and the Regulations. The argument misses the point. The question here is not whether the Corps or the EPA may take economic considerations into account in issuing the permit but rather whether the court's equitable power should be exercised on behalf of appellants. It is clear that the district court must weigh the balance of harms in determining whether to grant a preliminary injunction and we cannot say that in doing so here, it abused its discretion.
 
 
 35
 In light of appellants' failure to show the requisite irreparable injury, the order of the district court denying a preliminary injunction will be affirmed.
 
 
 
 *
 The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 No party argues that the appeal should be treated as moot. Since the permit will not expire until January 1996 and has not been exhausted, we agree that the appeal is not moot
 
 
 [2]
 Defendants do not argue, nor did the court find, that the Green Book supports their failure to comply with the requirement that three benthic species be tested with the solid phase. What the district court found was that the test procedures followed were the most conservative and would produce results of the worst case scenario and that they established that the proposed dumping would create no significant undesirable effects. That finding, however, does not support the court's conclusion that "the testing complied with the requirements of Sec. 227.6(c)(3)"