**PLAYBOY ENTERTAINMENT GROUP, INC., Graff Pay–Per–View Inc., Plaintiffs,**

v.

**UNITED STATES of America, United States Department of Justice, Janet Reno, Attorney General, Federal Communications Commission, Defendants.**

**Civil Action Nos. 96–94, 96–107–JJF.**

United States District Court,
D. Delaware.

March 7, 1996.

A. Gilchrist Sparks, III, Katherine R. Witherspoon, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware. Robert Corn–Revere, Jean S. Moore, Ronald J. Wiltsie, II, of Hogan & Hartson L.L.P., Washington, D.C. Burton Joseph, of Barsy, Joseph & Lichtenstein, Chicago, Illinois, for Playboy Entertainment Group, Inc.

William D. Johnston, John W. Shaw, of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware. Charles S. Sims, John Siegal, of Proskauer Rose Goetz & Mendelsohn L.L.P., New York City. Daniel Barsky, Jane Hatterer, New York City, for Graff Pay–Per–View Inc.

Frank W. Hunger, Assistant Attorney General, Gregory M. Sleet, United States Attorney, Patricia C. Hannigan, Assistant United States Attorney, of United States Attorney's Office, Wilmington, Delaware. Theodore C. Hirt, James J. Gilligan, Sarah L. Wilson, of United States Department of Justice, Washington, D.C. Christopher J. Wright, Deputy General Counsel, Daniel M. Armstrong, Associate General Counsel, of Federal Communications Commission, Washington, D.C., for Defendants.

## OPINION

FARNAN, District Judge.

## I. INTRODUCTION

Presently before the Court is the Application for a Temporary Restraining Order filed

by Playboy Entertainment Group, Inc. ("TRO") (D.I. 3).[1] Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Playboy seeks to prevent Defendants the United States, the United States Department of Justice, Attorney General Janet Reno, and the Federal Communications Commission ("FCC")[2] from implementing or enforcing Section 505 of the Telecommunications Act of 1996 (the "Act")[3] pending a preliminary injunction hearing before a three-judge court.[4] Playboy contends that Section 505 of the Act violates the First Amendment and the Equal Protection Guarantee of the Fifth Amendment of the United States Constitution. The Government opposes the granting of a TRO on the grounds that Playboy has failed to satisfy the TRO standards necessary to bar the enforcement of an Act of Congress. (D.I. 21 at 3.) As provided in the Act, Section 505 becomes effective on March 9, 1996, 30 days after it was signed by the President.

The Court has jurisdiction over this matter pursuant to Section 561 of the Act. This Opinion shall constitute the Court's Findings of Fact and Conclusions of Law.

## II. BACKGROUND

### A. *Section 505 of the Telecommunications Act of 1996*

Section 505 provides in its entirety:

SCRAMBLING OF SEXUALLY EXPLICIT ADULT VIDEO SERVICE PROGRAMMING.

(a) REQUIREMENT. In providing sexually explicit adult programming or other programming that is indecent on any channel of its service primarily dedicated to sexually-oriented programming,

a multichannel video programming distributor shall fully scramble or otherwise fully block the video and audio portion of such channel so that one not a subscriber to such channel or programming does not receive it.

(b) IMPLEMENTATION. Until a multichannel video programming distributor complies with the requirement set forth in subsection (a), the distributor shall limit the access of children to the programming referred to in that subsection by not providing such programming during the hours of the day (as determined by the Commission) when a significant number of children are likely to view it.

(c) DEFINITION. As used in this section, the term 'scramble' means to rearrange the content of the signal of the programming so that the programming cannot be viewed or heard in an understandable manner.

Section 505 requires a video programming distributor ("a cable operator") to scramble "sexually explicit adult programming or other programming that is indecent" which is transmitted on a channel "primarily dedicated to sexually oriented programming," often referred to as an "adult network." Section 505 requires that any such channel must be fully scrambled regardless of whether scrambling has been requested by the customer. If a cable operator does not or cannot comply with this "blocking requirement," it is prohibited from transmitting the adult channel programming during hours of the day when minors are most likely to view it. Section 505 provides that said hours shall be determined by the FCC.[5] Cable operators must

---

1. Subsequent to the filing of the instant action, Graff Pay–Per–View, Inc. filed a similar action against Defendants. *See Graff Pay–Per–View v. Reno*, C.A. 96–107–JJF. Simultaneously with the filing of its Complaint, Graff filed an Unopposed Motion to Consolidate its action with the instant action. The Court entered an Order granting Graff's motion.

2. The Court will refer to the Defendants as the "Government."

3. Section 505 of the Telecommunications Act will be codified at 47 U.S.C.A. § 561.

4. Section 561 of the Act requires that facial challenges to the Act's constitutionality must be heard by a district court of three judges empaneled pursuant to 28 U.S.C. § 2284.

5. *See* Order and Notice of Proposed Rulemaking amending 47 C.F.R. § 76 (F.C.C., effective March 9, 1996). By this action, the FCC has set the hours of 10 p.m. to 6 a.m. for adult programming as contemplated by Section 505. *Id.* at III.A.

be in full compliance with the Section 505 blocking requirements by March 9, 1996, or risk exposure to possible enforcement by the Government and resulting penalties.

### B. History of Section 505

The Telecommunications Act of 1996, enacted on February 9, 1996, resulted from a Congressional effort spanning several years to restructure the telecommunications industry. Extensive debates and hearings were held by both the United States Senate and House of Representatives on numerous issues addressed by the Act, although no hearings were held with regard to the provisions of Section 505.

During the final days of Congress' consideration of the Telecommunications Act, Senator Diane Feinstein of California, on her behalf and on behalf of Senator Trent Lott of Mississippi, introduced Amendment 1269 which ultimately became Section 505 of the Act. Although Senator Feinstein spoke at length about the amendment at the time of its introduction, no hearing or debate was held, and the amendment was voted upon and passed the same evening as its introduction. 141 Cong.Rec. S8167 (daily ed. June 12, 1995).

Senator Feinstein, in addressing the Senate, stated that the blocking requirements required by the amendment were "rather simple and direct ... [and] common-sense...." The Senator asserted that such an amendment was needed despite other provisions of the Act that addressed similar concerns.[6] In support of this assertion, Senator Feinstein cited a communication she received from a local city councilman from Poway, California, a suburb of San Diego, who told the Senator that 320,000 cable customers in the Poway area were receiving unscrambled and sexually explicit audio and video cable programming although they had not subscribed to it. Senator Feinstein observed that the Poway experience was not an isolated incident. The Senator noted that in Washington, D.C., unscrambled sexually explicit pornography had been transmitted to non-subscribing cable customers. Although the Senator acknowledged that the National Cable Television Association had adopted guidelines concerning such transmissions (see Aff. D. Brenner ¶ 4), the Senator found that these endeavors were insufficient:

> The problem is that there are no uniform laws or regulations that govern such sexually explicit adult programming on cable television. Currently, adult programming varies from community to community, as does the amount and effectiveness of scrambling on each local cable system. Right now, it is up to the local cable operator to monitor itself. This is like the fox guarding the hen house.
>
> ... the voluntary guidelines simply recommend that local cable operators "block the audio and video portions of unwanted sexually-oriented premium channels at no cost to the customer, upon request." While this is a somewhat commendable effort on the part of the industry, I do not think it goes far enough.
>
> ....
>
> I do not believe that sexually explicit adult programming should automatically be broadcast into a program subscriber's home. On the contrary, I believe that sexually explicit programming should be automatically blocked, unless a program subscriber specifically requests the programming.

In response to the cable industry's concerns about technology problems and extraordinary fiscal costs that the amendment would impose on them, Senator Feinstein advised:

> The bottom line, however, is that fully scrambling both the audio and video portion of a cable program is technologically feasible.... With regard to their fiscal concerns, I have never been given any information from the industry to document what the actual costs to cable operators would be.

Senator Feinstein concluded that the amendment gave cable operators options, and the

---

**6.** Specifically, Section 504 of the Act requires that "[u]pon request by a cable service subscriber, a cable operator, shall, without charge, fully scramble or otherwise fully block the audio and video programming of each channel carrying such programming so that one not a subscriber does not receive it." Section 504(a).

fact that the operators had 30 days to comply gave them ample time:

> ... the amendment leaves it up to the local cable operator on how and when to come into full compliance....
>
> This amendment also does not become effective until 30 days after enactment, so cable operators will have plenty of time to either fully block the programming, or restrict access to certain times of the day.

*Id.*

Senator Lott, addressing the Senate after Senator Feinstein, emphasized that he did not "want to exaggerate what this amendment will do. It simply requires cable operators to fully scramble sexually explicit programming if someone has not subscribed for such programming." *Id.* at S8169.

Attached to the legislative record, although apparently not discussed on the floor, is a memorandum from a legislative attorney for the American Law Division of the Congressional Research Service, Library of Congress, which opined as to the constitutionality of the proposed amendment. *Id.* at S8168. The legislative attorney reviewed current legal standards concerning restrictions on cable television. He concluded that the amendment was constitutional; however, he cautioned that the phrase "during hours of the day (as determined by the Commission) when children are most likely to view it" could be found to be overly broad, noting that this provision might have to be modified to "prohibit such programming when the ratio of children to adults is significantly high." *Id.*

The amendment passed by a unanimous vote.

## C. The Fundamentals of Cable Television Programming

Cable television is a service that presently can provide cable customers with a choice of over 100 channels of programming. Unlike broadcast television,[7] cable television is available only to those customers who choose to pay for it. Subscribers may choose from several available "packages." For example, "basic" cable service generally includes several broadcast stations, their local affiliates, and additional channels such as the Discovery channel, A & E television, CNN and C-Span. Customers may choose other "premium" packages which provide additional programming channels, such as HBO/Cinemax, Showtime/The Movie Channel and Playboy Television. Additionally, many cable system operators offer Pay–Per–View programming, in which subscribers may view a certain movie at a certain time on their television for a set fee.

The technology involved in cable television is fairly straightforward. Signals from various sources such as master antennas, satellites, or local television studios are received by the cable operator and then transmitted by the cable operator from its facility to customers' houses. The cable operator transmits the signals to customers through coaxial cable. (Aff. Ciciora ¶ 5.) [8]

From the inception of cable television systems, coaxial cables have provided the capacity to carry many more channels of television programming than can be provided by broadcast television channels. (Aff. Ciciora ¶ 6.) For example, because of interference from stations operating on the same channel in other communities and from stations operating on adjacent channels in the same community, the number of broadcast channels available over the airways in one community could not exceed seven (as in New York City) and rarely exceeded three or four. Because cable systems did not use the airwaves, they did not experience channel interference problems and therefore could transmit programming over their entire 12–channel capacity. (Aff. Ciciora ¶ 7.) With the advent of satellite-delivered programming, cable systems began to expand the capacity of their coaxial transmission facilities to 36, 54 and even 100 channels.

As more households subscribed to cable television and more cable systems increased

---

7. Broadcast television uses a signal received by household antenna via airwaves.

8. Walter S. Ciciora was Vice President, Technology, Time Warner Cable from 1989 to 1993, and in that capacity was primarily responsible for cable technology matters. (Aff. Ciciora ¶ 2).

their channel capacity beyond the 12 channels, television set manufacturers began making "cable-ready" or "cable-compatible" television sets. These sets are capable of directly tuning the nonbroadcast channels typically used by cable systems. Cable subscribers who own cable ready television sets do not need converter devices to tune those channels, unless the audio or video signals are scrambled by the cable system. (Aff. Ciciora ¶ 9.)

### D. Practical and Technical Difficulties with Compliance Under Section 505 as Alleged by Playboy

Playboy acknowledges that scrambling and other technologies exist to comply with the provisions of Section 505; however, it asserts that the existing options either fail to fully block the non-subscribed programming or are impossible to install by March 9, 1996.

According to Playboy, all existing cable operators employ technology to protect their premium and pay-per-view channels ("premium services") so that only paid subscribers will be able to receive and view those channels. (Aff. Ciciora ¶ 10.) This technology takes one of three forms and is intended to prevent the audio or video signals of the cable channels from being seen or heard by non-subscribers. These three methods are the installation of: 1) a "scrambler"; 2) a "trap" or a "parental lockout feature ("lockbox")"; or 3) substituted video/audio with lockbox. (Aff. Ciciora ¶¶ 11, 16, 22.)

The first option, scrambling, prevents video transmission of the non-subscribed channels, but fails to prevent audio transmission unless additional technology, called "mapping" is used. Scrambling is the implementation of any of a variety of means employed at the "headend" or cable system transmission facility (to distinguish between devices employed at the individual household level) that alters a portion of the television signals so that the picture on the receiving television is impaired. Subscribers to premium networks receive a converter/descrambler (commonly called an "addressable converter") that has the ability to descramble the video alterations and restore the picture. (Aff. Ciciora ¶ 11.) While the audio portion of a signal can also be scrambled at the headend, most manufacturers of scrambling equipment manufacture only headend equipment and converter boxes capable of scrambling and descrambling video, not audio signals. Consequently, the audio portion of a signal is rarely, if ever, scrambled at the headend. (Aff. Ciciora ¶ 12.)

Thus, when used alone, scrambling fails to suppress the audio of the unwanted channels (absent the use of mapping converters). In addition, scrambling can also fail to prevent the bleeding of the unwanted video signal of adult channels onto the television screens of "basic" programming customers. To prevent this bleeding of non-subscribed programming to the screens of basic customers, cable operators can utilize a "trap" or "lockbox" option.

A "trap" is a piece of hardware that is installed on the cable line coming into a basic programming customer's house. A "negative" trap removes or filters a designated channel signal from a group of incoming channel signals. In the alternative, a converter/descrambler or a lockbox containing traps or filters can be installed on all customers' televisions and VCRs. (Aff. Ciciora ¶ 16.)

Finally, cable operators can prevent cable customers from receiving non-subscribed programming by the use of newer versions of converter/descramblers which substitute alternative video and audio for the scrambled signal. These devices are referred to as a lockbox and permit a parent, through the use of a parental key or personal identification number, to block a television set from receiving the audio or video signal from any selected channel. This technology costs approximately $115.

Playboy offered the testimony of Wayne Hall, Vice President of Harron Communications Corporation ("Harron") to establish the difficulties facing a cable operator seeking to comply with Section 505. By affidavit, Mr. Hall testified that Harron has 245,000 cable subscribers in a seven-state area, approximately 123,000 of which have addressable converter/descramblers. Harron provides all its subscribers, upon request, with a converter/descrambler having a parental lockbox

feature. Although Harron rarely receives complaints about the bleeding of audio or video signal from any premium channel, in order to comply with Section 505 Harron would have to provide blocking devices to approximately 122,000 households that do not presently have them. With only one installer for every 2,500 customers, Mr. Harron testified that it would be impossible for Harron to install blocking devices on those households without a lockbox within any 30 day period, let alone by March 9th. Thus, according to Playboy, if Section 505 is implemented, the only economically viable solution for Harron would be to remove its adult oriented programming except for the late-night hours designated by the FCC for such programming. (Aff. Hall ¶¶ 1–10.)

### E.  Description of The Playboy Networks

Playboy produces and distributes cable video programming through its two programming networks, Playboy Television and AdulTVision ("the Playboy networks"). The Playboy networks are provided only to adult cable subscribers and only upon request. Playboy also produces and/or licenses, on an exclusive or non-exclusive basis, its programming for use on other major premium networks such as Showtime/The Movie Channel and HBO/Cinemax. According to Playboy, it is not uncommon for the same programming to be shown by both Playboy Television and other non-adult oriented premium or Pay–Per–View networks such as Showtime/The Movie Channel, HBO/Cinemax, Viewer's Choice/Hot Choice, or Action Pay–Per–View. (Aff. Lynn ¶¶ 4, 6, 10–12.) [9]

In addition, Playboy asserts that Playboy Television offers a wide variety of programming, consisting of lifestyle information, news, music, video fiction and short stories, comedy, and other programming that is not sexually explicit. In addition to its regular programming, Playboy contends that Playboy Television provides special programming such as its recent December 1, 1995 four-hour programming on AIDs awareness and safe sexual practices which was done in con-

nection with the World AIDS Day created by the World Health Organization in 1988. (Aff. Lynn ¶ 9.)

Playboy states that it has standards and guidelines it uses in determining what programming will be suitable for the Playboy networks. Playboy contends that its standards and guidelines are designed to eliminate any material that can be deemed patently offensive. In order to implement its standards Playboy employs four in-house lawyers who allegedly review all Playboy programming to ensure that it is neither obscene nor violative of any community standards. (Aff. Lynn ¶ 14.)

Playboy asserts that no court or administrative agency in any jurisdiction has ever found the Playboy networks or any of their programming to be either obscene or harmful to minors. Similarly, Playboy contends, in over forty years of publication, not one issue of Playboy magazine has ever been found to be obscene or harmful to minors by any judicial or administrative system, state or federal. In support of this contention Playboy notes that the United States Attorney General's Commission on Pornography concluded that Playboy magazine is "plainly non-offensive." (Aff. Lynn ¶ 15.)

### III.  PARTIES CONTENTIONS

In this litigation, Playboy contends that it is entitled to a TRO against the implementation and enforcement of Section 505 the Act. Playboy contends that it is likely to succeed on the merits of the case, because: (1) the First Amendment forbids the application of indecency regulations to television programming (D.I. 7 at 18); (2) the Government has not established any compelling governmental interest in support of Section 505 (D.I. 6 at 29); (3) the requirements imposed by Section 505 are content-based and are accordingly unconstitutional (D.I. 7 at 31); and (4) Section 505 does not constitute the least restrictive means of serving the Government's interest (D.I. 7 at 40).

---

**9.** Anthony J. Lynn is President, Playboy Entertainment Group and Executive Vice President, Playboy Enterprises. (Aff. Lynn ¶ 1.)

In addition, Playboy contends that it will suffer irreparable injury if the Defendants are not enjoined (D.I. 7 at 48), that the balance of interest between the parties supports the issuance of a TRO (D.I. 7 at 50) and, finally, that the public interest supports the issuance of a TRO (D.I. 51).

In response, the Government contends that Playboy has failed to meet the standard required to enjoin the implementation of an Act of Congress. First, the Government argues that an Act of Congress cannot be enjoined absent a showing of compelling circumstances, and that in order for temporary injunctive relief to be granted, the Court must conclude that each of the four factors considered when ruling on a TRO weigh in favor of the plaintiff, which the Government contends Playboy cannot do. (D.I. 26 at 11.) The Government further contends that Playboy cannot establish that it has a likelihood of success on the merits because: (1) the Government has the authority to restrict access by children to indecency in cable television (D.I. 26 at 13); (2) Section 505 is supported by the Government's compelling interest in protecting minors from indecent televisions programming (D.I. 26 at 17); (3) Section 505 employs the least restrictive means available to further the Government's interests, in that other courts have upheld similar blocking and time-channelling including positive traps. Further, the Government argues that voluntary measures are ineffective, and Section 505 is not a prior restraint on free speech (D.I. 20–28); (4) Section 505 is neither vague nor overbroad (D.I. 26 at 28); and (5) Section 505 does not impermissibly discriminate against indecent programming on channels dedicated to sexually explicit programming (D.I. 26 at 32).

The Government also asserts that Playboy cannot meet the standard for a TRO because Playboy has not carried its burden of establishing irreparable harm. (D.I. 26 at 36.)

Finally, the Government contends that the harm to the Government, and the public interest, outweighs Playboy's assertions of harm. (D.I. 26 at 42.)

## IV. LEGAL STANDARD OF REVIEW

■ Four factors must be considered when ruling on a motion for temporary injunctive relief. Those factors are: 1) the likelihood that the applicant will prevail on the merits; 2) the extent of irreparable injury to the applicant as a result of the conduct complained of; 3) the extent of irreparable harm to the defendant if temporary injunctive relief is granted; and 4) the public interest. *Clean Ocean Action v. York*, 57 F.3d 328, 331 (3d Cir.1995); *S & R Corp. v. Jiffy Lube Int'l*, 968 F.2d 371, 374 (3d Cir.1992). In order to grant an application for a temporary restraining order, the Court must conclude that each of the four factors weighs in favor of granting temporary injunctive relief. *Id.*

## V. DISCUSSION

### A. The Likelihood That Playboy Will Prevail on the Merits

#### 1. Constitutional Standard of Review

■ The parties have agreed that at this juncture the strict scrutiny standard of constitutional review applies to Playboy's facial challenge to Section 505.[10] The focus of a strict scrutiny review of an Act of Congress is to determine whether or not the legislation, in this case, Section 505 represents the least restrictive means of achieving the Government's interest. In this case, the Government's interest is to ensure that minors do not have access to non-subscribed adult programming on cable television. With this standard in mind, the Court will proceed to determine whether Playboy has met its burden to demonstrate that it is likely to succeed on the merits with regard to its assertion that Section 505 is unconstitutional.

**10.** In general, sexual expression which is indecent, but not obscene, is protected by the First Amendment to the United States Constitution. *Sable Communications of California, Inc. v. FCC*, 492 U.S. 115, 126, 109 S.Ct. 2829, 2836–37, 106 L.Ed.2d 93 (1989). However, indecent speech may be regulated by the Government in order to promote a compelling interest, provided that the Government chooses the least restrictive means to further its articulated interest. *Id.* The least restrictive means will further the Government's interest through narrowly tailored regulations which do not unnecessarily interfere with First Amendment freedoms. *Id.*

### 2. Analysis of the Likelihood of Success on the Merits

■ After considering the record evidence and arguments presented by the parties, the Court concludes that Playboy has raised serious and substantial questions as to whether the blocking and FCC time requirements imposed on cable operators by Section 505 of the Telecommunications Act of 1996 constitute the least restrictive means of achieving the Government's interest in regulating the accessibility of adult programming to minors. Playboy has established that Section 505 may unconstitutionally infringe upon its rights under the First Amendment. At this stage of the proceedings, the Court credits Playboy's assertion that substantially less restrictive means are available to serve the Government's purpose. For instance, Playboy's suggestion that the lockbox technology supplied by cable operators to customers who request it can be an effective and reasonable alternative to the methods dictated by Section 505.

Further, the Court concludes that implementation and enforcement of Section 505 may effectively force cable operators to air Playboy only after 10 p.m.. Importantly, such action could occur in the absence of any examination of alternative means, either by Congress or through discovery in this litigation. Because of the obvious importance of First Amendment guarantees, at a minimum, the Court is convinced that further investigation is needed to properly examine the Playboy programming and the feasibility of using alternative technologies prior to permitting the implementation of Section 505.

Although this Court has addressed in a limited manner the merits of this litigation and found a likelihood of success has been demonstrated by the Plaintiff, the Court trusts that the parties understand that a full consideration of the constitutional questions presented here can only be addressed by the three-judge court empaneled to hear this matter.

### 3. Irreparable Harm

■ While the judicial power to stay an act of Congress is "an awesome responsibility calling for the utmost circumspection",

Heart of Atlanta Motel v. United States, 85 S.Ct. 1, 2, 13 L.Ed.2d 12 (1964) (Black, J., in chambers), the judiciary's responsibility to enforce the First Amendment's express right of free speech is no less important. Accordingly, the United States Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable. injury." Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976). Although a plaintiff does not establish irreparable harm simply by asserting a First Amendment violation, the Court of Appeals for the Third Circuit has held that the requisite harm is established where the plaintiff shows that an act of Congress has "a chilling effect on free expression." American Civil Liberties Union, et al., v. Reno, No. CIV. A. 96–963, 1996 WL 65464 (E.D.Pa. Feb. 15, 1996), citing Hohe v. Casey, 868 F.2d 69, 72 (3d Cir.1989).

Based on the evidence before it, the Court concludes that Playboy has shown that implementation of Section 505 will have a "chilling effect" on the adult-oriented cable television industry. Through the submission of affidavits from industry executives, Playboy has shown that adult-oriented cable television will effectively be turned off upon the implementation of Section 505. In the Court's view, Playboy has established that the short, 30 day implementation period provided for in Section 505 does not allow adequate time for cable companies to acquire and install the required blocking devices. Additionally, record evidence establishes that the cost of installing such devices in every home which subscribes to cable television would be crippling to the cable companies. Furthermore, Playboy has adduced evidence that upon implementation of Section 505 many cable operators who carry Playboy programming will be forced to curtail their transmission of the adult programming to the FCC imposed hours of 10:00 p.m. to 6:00 a.m. The Court is persuaded that such a substantial reduction of viewing time will cause significant financial losses for both the cable companies and Playboy.

Conversely, the Court concludes that the Government has not established that irrepa-

rable harm to the Government's interest will result if temporary injunctive relief is granted. Although not required, there is an absolute void of legislative findings that Section 505 is necessary to protect minors from exposure to sexually oriented material shown on adult cable channels which their parents have chosen not to subscribe to. While it is undisputed that video and audio signals of adult programming channels occasionally bleed into the homes of nonsubscribers, the legislative record contains no findings as to how often this bleeding occurs, how many minors are exposed to the adult programming when the bleeding occurs or what effect such exposure has on minors.

As a result, based on the evidence presented the Court concludes that Playboy has established that denial of temporary injunctive relief will have a chilling effect on the adult-oriented cable television industry. Therefore, the Court concludes that the irreparable harm that Playboy will suffer if temporary injunctive relief is denied substantially outweighs any harm the Government will suffer if temporary injunctive relief is granted.

### 4. The Public Interest

The Court is also persuaded that Playboy has established that the public interest will not be negatively affected if temporary injunctive relief is granted and that maintaining the status quo will not harm the public interest. The contention of the Government that the public interest will be negatively affected if relief is granted is unpersuasive.

The dilemma of how to effectively shield minors from adult programming is not novel; it has existed for at least a decade. Accordingly, several protective methods are already in place in the cable television industry to permit subscribing parents to completely block out adult programming signals they feel are inappropriate. These protective measures, which include converters and lockboxes, completely eliminate the bleeding problem and are available upon request to cable customers. At this stage of the pro-

ceedings, the Court is convinced that these devices are sufficient to provide cable customers with adequate protection until the parties are able to fully litigate the constitutional issues that are beyond the scope of this preliminary proceeding. Thus, the Court concludes that even if the Government has a compelling interest in shielding minors from adult programming, given the length of time the problem has existed and the protective devices already in place, the public interest does not override the irreparable harm that will be suffered by Playboy and the adult-oriented cable television industry if temporary relief is not granted.

### 5. Balancing of Hardships

The balancing of hardships ensures that the imposition of an injunction preserving the status quo will not harm the Government more than Playboy. See Opticians Assoc. of America v. Independent Opticians of America, 920 F.2d 187, 196 (3d Cir.1990). The Court has concluded that the potential harm to Playboy absent the issuance of a TRO is substantial. On the other hand, the Court is persuaded that the harm to the governmental interest is minimal. Maintenance of the status quo will mean that parents can continue to block programming on their own or by requesting blocking services from their local cable operator. Although some bleeding or audio breakthrough may continue to occur during the duration of the TRO, the Government could not articulate what impact such occurrences might have on the target of the Government's announced interest [i.e., minors].[11] Accordingly, the Court concludes that the balance of hardships tips strongly in Playboy's favor.

### VI. CONCLUSION

For the reasons discussed, the Court concludes that Playboy has met its burden on the relevant factors needed to obtain temporary injunctive relief. Specifically, Playboy has shown a likelihood of success on the merits, irreparable harm if relief is denied, that the Government will not be irreparably

---

11. From the record evidence presented at this time, the Court infers that the content of the audio signal that may be heard is akin to the utterances of actress Meg Ryan during her performance in the diner scene in the movie When Harry Met Sally.

harmed if relief is granted and that granting of relief will not adversely affect the public interest. In sum, the Court concludes that a balancing of all the relevant factors weighs in favor of granting temporary injunctive relief.

An appropriate Order will be entered.