

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-30-1999

# CT General Life v. Comm IRS

Precedential or Non-Precedential:

Docket 97-7612

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation
"CT General Life v. Comm IRS" (1999). *1999 Decisions*. Paper 114.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/114

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 30, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 97-7612

CONNECTICUT GENERAL LIFE INSURANCE COMPANY,

      Appellant

v.

COMMISSIONER OF INTERNAL REVENUE
(Tax Court No. 92-21212)

NO. 97-7619

CIGNA CORPORATION AND CONSOLIDATED
SUBSIDIARIES,

      Appellants

v.

COMMISSIONER OF INTERNAL REVENUE
(Tax Court No. 92-21213)

On Appeal from the
United States Tax Court
Tax Court Judge: Hon. Stephen J. Swift

Argued September 14, 1998

Before: SLOVITER, SCIRICA and ALITO, Circuit Judges

(Filed April 30, 1999)

A. Duane Webber (Argued)
Leonard B. Terr
C. David Swenson
Baker & McKenzie
Washington, D.C. 2006-4078

Of Counsel:
Judith E. Soltz
D. Timothy Tammany
Christopher R. Loomis
CIGNA Corporation

Alfred W. Putnam, Jr.
Gregg R. Melinson
Drinker Biddle & Reath, LLP
Philadelphia, PA 19107

 Counsel for Appellants,
Connecticut General Life
Insurance Company and CIGNA
Corporation and Consolidated
Subsidiaries

Loretta C. Argrett
 Assistant Attorney General
Charles Bricken
David I. Pincus
Thomas J. Clark (Argued)
Department of Justice
Tax Division
Washington, D.C. 20044

 Counsel for Appellee

OPINION OF THE COURT

SLOVITER, Circuit Judge.

Connecticut General Life Insurance Company, appellant in No. 97-7612, and CIGNA Corporation and Consolidated Subsidiaries ("the CIGNA Group"), appellants in No. 97-7619, appeal from the judgment of the United States Tax

Court upholding notices of deficiency issued against them by the Commissioner of Internal Revenue in the amount of $62,176,665. For convenience, we will refer to the appellants collectively as "CIGNA." CIGNA complains that the Tax Court improperly deferred to the Commissioner's restrictive interpretation of the section of the Internal Revenue Code that limits the ability of affiliated insurance companies to file consolidated federal income tax returns. Because we conclude that the applicable Treasury regulation, as interpreted by the Commissioner, is a permissible interpretation of the statute, we will affirm.

I.

BACKGROUND

Traditionally, life insurance companies ("life companies") have been profitable, whereas companies writing property or casualty insurance (P&C) have often been unprofitable. Nonlife insurance companies ("nonlife companies") have long been permitted to file consolidated federal income tax returns with their affiliated nonlife companies, but not with their affiliated life insurance companies. Life companies were required to file separate returns or returns consolidated with other affiliated life companies.

The restrictions on life-nonlife consolidation were loosened when Congress enacted the Tax Reform Act of 1976. Pub. L. No. 94-455, 90 Stat. 1520. That Act modifies the Internal Revenue Code to permit life companies to file consolidated returns with nonlife companies, subject to certain exceptions (the "life-nonlife consolidation provisions"), for all taxable years beginning after December 31, 1980. See 26 U.S.C. SS 1501, 1503-1504. At issue in this case is the interpretation of one of these statutory provisions, specifically the provision that limits certain setoffs between affiliated insurance companiesfiling consolidated returns.

3

A.

The Statute

Section 1501 grants affiliated groups the privilege of making consolidated returns with their affiliated companies. If the affiliated group contains both life and nonlife members, S 1504 requires that a company belong to the group for at least five years before it is treated as affiliated therewith. Section 1503 then limits the extent to which losses incurred by nonlife members may be set off against gains realized by life members. Subsection (c)(1), in particular, caps the amount of nonlife setoff at a percentage of either nonlife loss or life income, whichever is less. It states:

> (1) In general--If . . . the consolidated taxable income of the [nonlife members] results in a consolidated net operating loss for such taxable year, then . . . the amount of such loss which cannot be absorbed in the applicable carryback periods against the taxable income of such [nonlife members] shall be taken into account in determining the consolidated taxable income of the affiliated group for such taxable year to the extent of 35 percent [30 percent in 1982] of such loss or 35 [30 percent in 1982] percent of the taxable income of the [life members], whichever is less.

26 U.S.C. S 1503(c)(1).

Subsection 1503(c)(2), the provision at issue here, further limits a group's ability to set nonlife losses off against life profits, providing: "Notwithstanding the provisions of paragraph [1503(c)(1)], a net operating loss for a taxable year of a [nonlife member of the group] shall not be taken into account in determining the taxable income of a [life member of the group] . . . if such taxable year precedes the sixth taxable year such members have been members of the same affiliated group . . . ." (emphasis added). Resolution of the instant dispute requires us to determine the scope of this latter limitation.

4

B.

The Acquisitions

The facts of this case are not in dispute. See First Stipulation of Facts, App. at 71–88; Second Stipulation of Facts, App. at 89–104. On March 30, 1982, Connecticut General Corporation (Connecticut General), was the common parent of more than forty affiliated subsidiaries (the CG Group), one of which was a life company, Connecticut General Life Insurance Company (CGL). The CG Group met the definition of an affiliated group under S 1504 and had filed a consolidated tax return following the Code revision. Thereby, the CG Group was able to offset some of CGL's income with a portion of the CG Group's nonlife loss. App. at 75–76.

At that time, INA Corporation (INA) was parent to over 160 affiliated nonlife subsidiaries (the INA Group), which subsidiaries met the requirements of S 1504 and filed consolidated returns under S 1501. The INA Group's strength was in property and casualty insurance, while the CG Group's strength was in the areas of life, health and annuity, and personal and commercial property insurance. App. at 75–78.

The following day, March 31, 1982, Connecticut General and INA (the two parent companies) merged to form a new company, CIGNA Corporation (CIGNA Corp.). The merger was a "reverse acquisition" within the meaning of 26 C.F.R. S 1.1502–75(d)(3), pursuant to which CIGNA Corp. succeeded Connecticut General as the common parent of the CG Group, which continued to exist for tax purposes. CIGNA Corp. also became the common parent of each of the former members of the INA Group, which group ceased to exist for tax purposes. App. at 73–74. Thus, in effect, the CG Group, which became the CIGNA Group, acquired the former INA subsidiaries individually.

Subsequently, on November 20, 1984, a subsidiary of CIGNA Corp. acquired Preferred Health Care, Inc. (PHC). Like INA and Connecticut General before the merger, PHC was itself common parent to a group of affiliated corporations (the PHC Group) (all nonlife companies), which

5

qualified under S 1504 and filed consolidated returns under S 1501. All members of the PHC Group became members of the CIGNA Group upon acquisition and the PHC Group itself ceased to exist. App. at 75, 79-80.

C.

The Promulgation of Regulations

On June 8, 1982, approximately two months after the Connecticut General/INA merger, the Commissioner, pursuant to 26 U.S.C. S 1502, promulgated proposed rules relating to the filing of life-nonlife consolidated returns. See Filing of Life-Nonlife Consolidated Returns, 47 Fed. Reg. 24,737 (1982). The proposed regulations adopted a subgroup method for computing a life-nonlife group's consolidated taxable income. In effect, they treated the members of the group as two separate subgroups, with the life members as one subgroup and the nonlife members as another. Each subgroup was required to set off the gains and losses of members within that subgroup to determine whether the subgroup incurred a consolidated net operating loss (CNOL) or a gain. Only after the gains from within the nonlife subgroup were set off by losses from within that subgroup could such losses be used to reduce the life subgroup's income.

The regulations further limited the portion of a nonlife subgroup's consolidated net operating loss (nonlife CNOL) that could be set off (up to the statutorily prescribed percentage) against net operating gains generated by the life subgroup: "The offsetable nonlife consolidated net operating loss that arises in any consolidated return year . . . is the [nonlife CNOL] reduced by the amount of the separate net operating loss . . . of any nonlife member that is ineligible in that year." Id. at 24,748 (to be codified at 26 C.F.R. S 1.1502-47(m)(3)(vi)(A)) (emphasis added). The proposed rules thus distinguished between "eligible" companies -- those that had been members of the group for at least five years -- and "ineligible" companies -- those that had not been members for at least five years.

6

CIGNA wrote to the Commissioner on February 28, 1983, suggesting that proposed regulation S 1.1502−47(m)(3)(vi)(A) not be adopted with respect to acquired groups. CIGNA suggested instead that "separate nonlife members be treated as one entity if they are acquired in a single transaction by one group but were members of a different group prior to their acquisition." Letter from Kenneth W. Gideon, Chief Counsel, IRS, to Judith Soltz, Senior Counsel, CIGNA Corp. 1 (March 22, 1983), App. at 197. Under CIGNA's suggested approach, the losses of one ineligible acquired member would be used to offset the income of other ineligible acquired members, before the losses of eligible members were used for that purpose. The effect would be to increase the amount of eligible nonlife loss remaining after all nonlife gains had been offset, and thus to increase the nonlife offset the group could claim against life income.

Final regulations had to be issued by March 14, 1983 to be effective for the 1982 taxable year. App. at 197; see also 26 U.S.C. S 1503(a). The Commissioner did not adopt CIGNA's suggestion before issuing these regulations, but after the final regulations were issued, Kenneth W. Gideon, Chief Counsel to the IRS, sent CIGNA a letter, stating: "[The] final life−nonlife consolidated return regulations . . . do not adopt your suggestion but the preamble to the final regulation indicates that it will be given further study." App. at 197. Gideon also noted that "a lack of time [had] prevented a complete and thoughtful analysis of [CIGNA's] proposed solution." App. at 197−98.

The final regulations and preamble did differ from the proposed regulations in three respects: (1) a new S 1.1502−47(m)(4) was added, which states in its entirety, "Acquired groups. [Reserved]"; (2) S 1.1502−47(m)(3)(vi)(A) was amended to note that its definition of ineligible NOL applies only "for purposes of . . . subparagraph (3)"; and (3) the preamble was amended to state:

> [T]he Treasury Department will study further whether it is appropriate to aggregate the income and losses of ineligible members in certain cases. For instance, notwithstanding the ordinary reading of section 1503(c)(2), it may be consistent with the intent of

7

section 1503(c)(2), or correct as a matter of policy, to aggregate the income and losses of ineligible members that filed a consolidated return prior to their acquisition by (and includibility in) another group that files a consolidated return.

Filing of Life-Nonlife Consolidated Returns, 48 Fed. Reg. 11,436, 11,447-48, 11,440 (1983).

D.

CIGNA's Consolidated Returns

In 1981, as soon as the Tax Reform Act of 1976 became effective, Connecticut General elected to take advantage of the opportunity the Act presented and treated CGL, its sole life insurance company affiliate, as an includible member of the CG Group, thereby setting off a portion of the CG Group's nonlife losses against CGL's income. For the years ending December 31, 1982 (which was after the INA acquisition) through December 31, 1985, CIGNA continued to file life-nonlife consolidated income tax returns. CGL, the only life company involved, had income throughout this period. The nonlife companies, which included, inter alia, those companies that were former members of the INA Group (for the 1982-85 returns) and the former members of the PHC Group (for the 1984-85 returns), had both income and loss. App. at 76, 80-81.

CIGNA computed its taxable income as follows:

> 1. It consolidated (netted out) the income and los ses of all nonlife companies to arrive at the consolidated net operating loss or income.

> 2. It consolidated (netted out) the losses (all in eligible) and income of the former INA group members to calculate the net operating loss attributable to those companies as a group.

> 3. It consolidated (netted out) the losses (all in eligible) and income of the former PHC group members to calculate the net operating loss attributable to those companies as a group.

8

4. It aggregated the operating losses of other non life companies acquired within less than five years of the return (and hence ineligible).

5. It added 2, 3, and 4 above to calculate the ine ligible net operating loss.

6. It subtracted the ineligible net operating loss  from 1 above to calculate the eligible net operating loss.

App. at 85–86.

This treatment of the individual member companies of a former group as if they were a single company has been called the single entity method. Under CIGNA's approach, the losses of the former group members were reduced by the income of the members of that group, and that reduced loss was the figure treated as ineligible and deducted from the consolidated net operating loss of all the members of the CIGNA Group.

As calculated by CIGNA, the acquisition of the INA Group had no effect on its tax liability, and the overall taxable income of the CIGNA Group (including the INA and PHC Groups) in the years 1982 through 1985 was equal to the sum of what would have been these three groups' separate taxable incomes had the groups not combined. See Appellants' Br. at 12, 20.

E.

The Commissioner's Audit

On June 23, 1992, the Commissioner of Internal Revenue issued notices of deficiency to CGL for its taxable year ending December 31, 1980, and to CIGNA Group for its taxable years ending December 31, 1982 through December 31, 1985. App. at 28–31, 45–53.

Following the mode of analysis set forth in 26 C.F.R. S 1.1502–47(m)(3)(vi)(A), the Commissioner calculated CIGNA's ineligible loss in the following manner:

1. The income and losses of all nonlife companies were consolidated (netted out) to arrive at the consolidated net operating loss or income.

9

2. The losses of each of the companies acquired wi thin less than five years of the return were aggregated to calculate the ineligible net operating loss.

3. The ineligible net operating loss was subtracte d from the figure arrived at after the calculation in 1 above to calculate the eligible net operating loss.

App. at 87.

The Commissioner thus applied the separate entity method under which each of the former members of the INA and PHC Groups (all nonlife companies) was treated as a separate entity whose loss, if any, was subtracted from the consolidated net operating loss because the member was affiliated less than five years. Because each acquired company is treated as a separate entity, the fact that it was part of a group acquisition or that the group, prior to being acquired, had previously filed a consolidated return is not taken into account or relevant to its tax treatment after the acquisition.

The contrasting methods made a substantial difference in the amount of net operating loss of the nonlife companies that could be taken into account in determining CIGNA's taxable income for 1982 through 1988. The following shows the result of the Commissioner's approach and that used by CIGNA in filing its returns with respect to the nonlife net operating loss eligible to reduce CGL's taxable income.

Eligible Nonlife Net Operating Loss

| Year | CIGNA Calculation | Commissioner Calculation |
|---|---|---|
| 1982 | ($34,888,309) | ($10,225,979) |
| 1983 | ($28,810,677) | ($ 8,351,216) |
| 1984 | ($116,008,516) | ($26,734,260) |
| 1985 | ($96,060,581) | ($94,424,416) |

(These numbers are undisputed and reflect the appropriate 30% or 35% limitation set forth in S 1503(c)(1)).

Thus, under the Commissioner's approach, because of the reduction in the eligible nonlife net operating loss, the CIGNA Group had $136,032,212 more consolidated taxable

income than under CIGNA's approach. App. at 42, 54. The Commissioner assessed the following deficiencies accordingly:

| Petitioner | Year | Deficiency |
|---|---|---|
| CGL | 1980 | $ 3,360,873[1] |
| CIGNA Group | 1982 | $15,080,878 |
| CIGNA Group | 1983 | $ 1,916,121 |
| CIGNA Group | 1984 | $41,066,157 |
| CIGNA Group | 1985 | $ 752,636 |

Total Tax Deficiency (exclusive of interest and penalties): $62,176,665[2]

On September 21, 1992, the CIGNA Group and CGL petitioned the Tax Court for a redetermination of the deficiencies set forth in the Commissioner's Notices of Deficiency. App. at 23-31, 38-53. The cases were subsequently consolidated. On February 23, 1996 and February 26, 1996, respectively, the Commissioner and CIGNA filed motions for summary judgment before the Tax Court. App. at 57-66. That court found in favor of the Commissioner. Connecticut Gen. Life Ins. Co. v. Commissioner, 109 T.C. 100 (1997). The CIGNA Group and CGL each filed a Notice of Appeal on November 21, 1997. App. at 2, 5.

The sole issue before the Tax Court was the proper calculation of the offsetable consolidated net operating loss of recently acquired nonlife companies (INA and PHC) when the group by which they were acquired (ultimately CIGNA) files a life-nonlife consolidated return under the auspices of S 1503(c)(1) and (2). The Tax Court found that "under [CIGNA's] single entity method losses of the ineligible nonlife companies of the former INA and PHC Groups were, in effect, indirectly made available to reduce income of

_____

1. The deficiency determined against CGL flows indirectly from the Commissioner's disallowance of a portion of the nonlife loss setoffs the CIGNA Group claimed on its returns. Resolution of CIGNA's claim regarding these setoffs will determine what, if any, deficiency is properly assessed against CGL. App. at 72-73.

2. In CIGNA's appellate brief, it reported that interest on the deficiency was more than $150 million at that time. Appellants' Br. at 3.

11

[CGL], the life company." Connecticut Gen. Life Ins. Co., 109 T.C. at 104. Because it also found the Commissioner's interpretation of the legislative regulations to be "sufficiently consistent with section 1503(c)(2) and its legislative purpose" to merit Chevron deference, see Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984), the court upheld the notices of deficiency. Connecticut Gen. Life Ins. Co., 109 T.C. at 111–12. The Tax Court had jurisdiction under 26 U.S.C. SS 6213(a), 6214(a) and 7442. We have jurisdiction to review that court's grant of summary judgment under 26 U.S.C. S 7482. Our review is plenary. See Lerner v. Commissioner, 939 F.2d 44, 46 (3d Cir. 1991).

II.

DISCUSSION

CIGNA contends that it was error for the Tax Court to uphold the deficiency assessments because the method CIGNA used in calculating its tax liability complied with all applicable laws and regulations. CIGNA's primary argument is that because none of the regulations adopted by the Commissioner in 1983 explicitly covers a group acquisition, it was free to follow any reasonable method to calculate the net operating loss of the members of the acquired INA and PHC Groups. See Gottesman & Co. v. Commissioner, 77 T.C. 1149 (1981) (holding that, after Commissioner proposed two conflicting regulations but adopted neither, leaving no regulation in place, the taxpayer's choice of one of the proposals was reasonable and would be sustained). It disagrees with the Commissioner's position that 26 C.F.R. S 1.1502–47(m)(3)(vi)(A) applies to acquired groups of nonlife companies, and it argues that the regulation is limited to acquisition of stand alone companies. As an alternative, CIGNA argues that if Regulation –47(m)(3)(vi)(A) is interpreted to govern the group acquisitions at issue, then that regulation is arbitrary, capricious, and therefore unenforceable.

When Congress enacted the Internal Revenue Code revisions on consolidated returns, it gave the Secretary of

12

the Treasury broad authority to promulgate necessary regulations with respect thereto. See 26 U.S.C. S 1502. Pursuant to this authority, the Secretary promulgated the regulations at issue here, which are deemed legislative in character. See Tate & Lyle, Inc. v. Commissioner, 87 F.3d 99, 104 (3d Cir. 1996).

Ordinarily, our review of an agency's construction of the statute it has been charged with executing is deferential. In Sekula v. FDIC, 39 F.3d 448 (3d Cir. 1994), we summarized our standard of review as follows:

> When reviewing an agency's construction of a statute, if the intent of Congress is clear, then we must give effect to that intent. If the statute is silent or ambiguous with respect to a specific issue, then a deference standard applies, and the question for the court becomes whether the agency's answer is based on a reasonable construction of the statute. In determining whether an agency's regulation complies with its congressional mandate, we look to see whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose. So long as the regulation bears a fair relationship to the language of the statute, reflects the views of those who sought its enactment, and matches the purpose they articulated, it will merit deference.

Id. at 451-52 (citations omitted).

To merit deference, an agency's interpretation of the statute must be supported by "regulations, rulings, or administrative practice." Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 212 (1988). We will not defer to "an agency counsel's interpretation of a statute where the agency itself has articulated no position on the question." Id.

Once an agency has adopted regulations interpreting the statute, the agency's consistent interpretation of its own regulation will also be accorded substantial deference. We "must defer to the [agency's] interpretation unless an `alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation.' " Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)

13

(quoting Gardebring v. Jenkins, 485 U.S. 415, 430 (1988)); accord Shell Oil Co. v. Babbitt, 125 F.3d 172, 176 (3d Cir. 1997).

Nonetheless, "[t]he responsibility to promulgate clear and unambiguous standards is upon the Secretary." Director, Office of Workers' Compensation Programs, U.S. Dept. of Labor v. Eastern Associated Coal Corp., 54 F.3d 141, 147 (3d Cir. 1995) (internal quotation marks omitted). Thus our deference to an agency's interpretation of its own regulations is "tempered by our duty to independently insure that the agency's interpretation comports with the language it has adopted." Director, Office of Workers' Compensation Programs, U.S. Dept. Of Labor v. Gardner, 882 F.2d 67, 70 (3d Cir. 1989).

A.

Whether an Applicable Regulation Has Been Adopted

In order for CIGNA to prevail on its primary argument, it must convince us that no regulation governs the manner in which consolidated net operating loss of acquired groups must be treated. At the outset, CIGNA faces a major hurdle because the Commissioner concededly did promulgate a regulation, -47(m)(3), which deals with the treatment of acquired nonlife members. CIGNA concedes that Regulation -47(m)(3) governs the treatment of acquired stand-alone nonlife members, but it argues that it does not cover the treatment of "acquired groups" of nonlife members. As to those, CIGNA asserts, there was no regulation promulgated by the Commissioner, who instead reserved that question for another day under Regulation -47(m)(4).

The Internal Revenue Service (IRS) interprets these regulations differently. It insists that Regulation -47(m)(3) applies to all ineligible nonlife companies, whether they are acquired individually or as part of a group. It interprets Regulation -47(m)(4) as doing no more than reserving a place in the Code of Federal Regulations for the Commissioner to insert a regulation requiring different treatment of acquired groups should the Commissioner later determine that such different treatment is appropriate.

14

CIGNA argues that, under Bowen, 488 U.S. at 212, the interpretation the Commissioner advances in this case is not entitled to deference because it is a "mere" litigating position. CIGNA's reliance on Bowen is misplaced. Bowen, which concerned the amount of deference due an administrative agency's informal interpretation of a statute, does not address what deference we should accord an agency's interpretation of its own regulations, such as is at issue here. Indeed, the Supreme Court has deferred to an agency's interpretation of its own regulations, even when that interpretation was proffered for the first time in litigation, see Gardebring v. Jenkins, 485 U.S. 415, 430 (1988), as have we, see Elizabeth Blackwell Health Ctr. for Women v. Knoll, 61 F.3d 170, 183 & n.9 (3d Cir. 1995).

Thus, we will defer to the IRS's interpretation unless that "alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation." Gardebring, 485 U.S. at 430.

1. The Text of -47(m)(4)

CIGNA insists that unless subsection 26 C.F.R. S 1.1502- 47(m)(3)(vi) applies only to the acquisition of individual companies, the heading "Acquired groups" on -47(m)(4) would be without significance. CIGNA emphasizes the designation of "[Reserved]" on that regulation and points to various definitions which equate the terms "reserved" and "reserve" with notions of setting aside or apart and of deferring a determination. CIGNA then further claims that this interpretation of "reserved" accords with both the Commissioner's past administrative practice and the understanding of former high-ranking treasury officials.

We are not convinced. We agree that use of the term "reserved" implies that something has been set aside. CIGNA, however, assumes that what was set aside was "the subject matter of the regulation" and further that the subject matter of the regulation was "the treatment of the loss of nonlife members acquired as a group." Appellant's Br. at 24. It is equally likely that what was set aside was the numerical subsection -47(m)(4) and the space in the regulation it demarcates.

CIGNA further attempts to establish that the "Commissioner's customary administrative practice[was to] interpret[ ] `reserved' in a regulation as a signal that there is no regulatory rule to govern the referenced subject matter" by identifying some instances in which the Commissioner used that term to have that meaning. Appellant's Br. at 24. That is not conclusive. In fact, the Office of the Federal Register, Document Drafting Handbook (1991), suggests a different use for the term "reserved." It describes "reserved" as "a term used to maintain the continuity of codification in the CFR" or "to indicate where future text will be added." Id. at 27. We find nothing in the precedent that CIGNA cites to preclude the Commissioner from using the term "reserved" in accordance with the Document Drafting Handbook, rather than to connote the absence of a substantive rule.

Finally, we accord little weight to the 1996 recollections of the several Treasury officials who submitted affidavits regarding the meaning of the reserved clause for acquired groups. In the first place, the affidavits are inconsistent: William McKee states that "reserved" means that no regulation addresses the treatment of the reserved issue, App. at 226, but Andrew D. Pike understood that the general rule would continue to apply until a special rule was created for acquired groups, App. at 229. Moreover, reliance upon remembered details from officials who lacked the ultimate authority to issue any proposed regulation has little support in the law. See Armco, Inc. v. Commissioner, 87 T.C. 865, 867 (1987) ("[N]o one's personal views can be accepted as a pronouncement of the intended meaning of the regulation."); cf. Western Air Lines, Inc. v. Board of Equalization, 480 U.S. 123, 131 n.* (1987) ("[The] attempt at the creation of legislative history through the post hoc statements of interested onlookers is entitled to no weight . . . .").

In sum, we, like the Tax Court, conclude that nothing in Regulation −47(m)(4) contradicts the Commissioner's interpretation of Regulation −47(m)(3)(vi) as applying to acquired groups. At most, Regulation −47(m)(4) is a"neutral factor." Connecticut Gen. Life Ins. Co., 109 T.C. at 109.

2. The Preamble

CIGNA next contends that the preamble supports its view
that there is no rule governing the acquisition of groups.
We have stated that "the preamble to a regulation may be
used as an aid in determining the meaning of a regulation."
Commonwealth of Pennsylvania v. United States Dept. of
HHS, 101 F.3d 939, 944 n.4 (3d Cir. 1996). Here, the
Preamble states, "[T]he Treasury Department will study
further whether it is appropriate to aggregate the income
and losses of ineligible members in certain cases. For
instance, notwithstanding the ordinary reading of
S 1503(c)(2), it may be consistent with the intent of
S 1503(c)(2), or correct as a matter of policy, to aggregate
the income and losses of ineligible members that filed a
consolidated return prior to their acquisition by (and
includibility in) another group that files a consolidated
return." Filing of Life-Nonlife Consolidated Returns, 48 Fed.
Reg. at 11,440.

This passage does not contradict the IRS's interpretation
of Regulation -47(m)(3)(vi) as applying to acquired groups.
Indeed, it suggests that applying a rule other than that
annunciated in -47(m)(3)(vi) would contradict "the ordinary
reading of section 1503(c)(2)." The passage does suggest
that it might be justifiable, nonetheless, to have such a
rule, and it indicates that officials within the Treasury
would consider adopting a different rule for acquired
groups. Significantly, no such special rule was ever
adopted. Under these circumstances, there is nothing
unreasonable about the Commissioner's enforcement of the
rule that did exist, a rule that, by its own terms, applies to
these facts.

Because the interpretation advanced by the IRS is neither
inconsistent with any prior interpretation of these
regulations nor incompatible with their plain text, we defer
to that interpretation. We thus regard -47(m)(3) as
applicable to acquired groups.

17

B.

Whether the Regulation is Arbitrary, Capricious,
and Unreasonable

CIGNA's alternative argument is that the regulation,
which is interpreted by the Commissioner to be applicable
to treatment of acquired groups, is not entitled to deference
because it is arbitrary, capricious, and unreasonable.
CIGNA concedes that we must defer to a regulation that is
a reasonable implementation of the congressional mandate,
but it argues that a regulation is only a reasonable
statutory interpretation if it " `harmonizes with the statute's
plain language, origin, and purpose.' " Appellants' Br. at 31–
32 (citing National Muffler Dealers Ass'n v. United States,
440 U.S. 472, 477 (1979)). Thus, we must review the
legislative history of the Tax Reform Act of 1976 with an eye
toward discerning the origin and purpose of the revision
allowing life–nonlife consolidated tax returns.

In the debates before Congress, it was suggested that
lifting the ban on life–nonlife consolidated returns would
help alleviate the acute shortage of insurance writing
capacity in the property and casualty industry. See, e.g.,
122 Cong. Rec. 24,683 (statement of Sen. Ribicoff), 24,687
(statement of Sen. Curtis); S. Rep. No. 94–938, at 456,
reprinted in 1976 U.S.C.C.A.N. 3439, 3882. The Senate
Report noted that P&C companies affiliated with other
nonlife companies had long been permitted to file
consolidated returns whereas P&C companies that
happened to be affiliated with life companies had not been
able to do so. See S. Rep. No. 94–938, at 454, reprinted in
1976 U.S.C.C.A.N. at 3881. The Report states: "[T]he
present ban on life–nonlife consolidations has been a
hardship for casualty companies which are affiliated with
life companies," and explains that "[t]he committee
amendment deals with this problem." Id.

At the same time, the legislators recognized that the
then–existing ban on consolidated returns had assured that
life insurance companies paid tax at the regular rate on an
amount approximately equal to their taxable investment
income. They sought to retain that result in drafting the

18

new life-nonlife provisions, presumably by limiting the permissible offset to a percentage of life income incorporated in S 1503(c)(1). See id.; Staff of the Joint Committee on Taxation, General Explanation of the Tax Reform Act of 1976 (H.R. 10612, 94th Congress, Public Law 94-455) at 435-36 (1976) ("[C]ongress adopted a provision which preserves the concept that some tax be paid with respect to the life insurance company's investment income . . . but which at the same time provides substantial relief in the future for casualty companies with losses.").3

Shortly before the bill was enacted, the Conference Committee added S 1503(c)(2), the section at the center of the CIGNA-IRS dispute. That section provides that the net operating loss of a member of the group of affiliated companies "shall not be taken into account" unless that member has been a member of that group for five years. The Conference Report does not suggest a reason for this amendment. The slim legislative history reveals merely that, during the hearings relating to the life-nonlife consolidation provisions, Senator Kennedy in particular had expressed some concern that the largest life insurance companies might seek to enlarge the tax benefit provided by the new provisions by acquiring small loss-ridden P&C companies for the purposes of generating nonlife losses and setting these losses off against their taxable income. See id. at 24,685 ("Those [life insurance companies] who have substantial profits can go out and purchase other companies with tax losses in order to be able to write these losses off."). Section 1503(c)(2), as enacted, thus appears to have been designed to discourage tax-motivated acquisitions by insurance companies.

CIGNA argues that the Commissioner's approach runs counter to the origins and purposes of the Tax Reform Act of 1976 "because it exacerbates the very problem that Congress sought to address by enacting the life-nonlife

_____

3. The Senate Report estimated that these provisions would "result in a decrease in revenues of $25 million in the fiscal year 1978, $55 million in the fiscal year 1979, $49 million in the fiscal year 1980, and $40 million in the fiscal year 1981." S. Rep. No. 94-938, at 457, reprinted in 1976 U.S.C.C.A.N. at 3884.

consolidation provisions." Appellants' Br. at 31. CIGNA notes that although, collectively, the former INA Group members suffered net losses in each of the four years following their acquisition, under the Commissioner's calculation the combined group's taxable income increased by $136 million and its tax liability increased by approximately $60 million over the same four-year period, thereby reducing the group's capacity to write insurance. CIGNA characterizes the Commissioner's interpretation of Regulation -47(m)(3)(vi) as thus "penaliz[ing] the P&C industry contrary to the purpose of the life-nonlife consolidation provisions." Appellants' Br. at 33.

CIGNA's assessment of the congressional purpose is overly narrow. Congress did have an interest in increasing the capacity of the industry to write P&C insurance, which it effected through S 1501, which enables P&C companies to offset (partially) their losses against the income of their life affiliates by filing consolidated returns. Nothing in the regulations promulgated by the Commissioner prevented the former CG Group from taking full advantage of this opportunity by filing a consolidated tax return for its affiliated companies and offsetting the P&C losses against life income, which it did beginning in 1981.

But, Congress apparently also had another subsidiary goal -- to limit tax-induced shopping for acquisitions. And when the former CG Group chose, within a year of the statute's effective date, to affiliate with the INA Group to form CIGNA, it ran into S 1503, the section Congress enacted to effectuate that subsidiary goal. Although CIGNA could continue to have the advantage of offsetting P&C losses within its historic group after the acquisition, it could not take advantage in any way of the losses of the INA Group. And CIGNA's protests notwithstanding, that is precisely what it seeks to do.

If none of the INA companies had income, S 1503 would be irrelevant, as the methods proffered by both CIGNA and the Commissioner would arrive at the same result; the same is true if all of the INA companies had income, as their income would be added to the income of the other affiliated companies. However, CIGNA proposes to permit the INA companies to offset income within the group by

20

losses within the group before that income is added to that of the other now affiliated companies. In terms that may be too simplistic for the hundreds of millions of dollars at issue, this reduces the amount of income that could be added to the total CIGNA income. As the Commissioner explains, the net operating loss of a company that has not been a member of the group for five years is thus being "taken into account" by reducing the total income.

Perhaps recognizing that S 1503 serves a goal other than that of increasing P&C capacity, CIGNA describes the purpose of that section narrowly: "Section 1503(c)(2) had a narrow[ ], targeted purpose, and was intended only to address the specific concern that life companies might have a tax incentive to acquire nonlife companies to take advantage of additional future loss offset benefits." Appellants' Br. at 36. CIGNA insists that S 1503(c)(2) "was intended only to limit the incremental consolidation benefit that might be derived from the acquisition of additional nonlife companies." Id. It then argues that the Commissioner's approach contradicts the statute by denying CIGNA more than this incremental benefit.

CIGNA points to nothing in the scant legislative history of this provision that compels such a narrow reading of S 1503(c)(2)'s purpose. Moreover, the statute contains no language that limits its effect to the denial of the incremental consolidation benefit. It says nothing more than that losses of companies that affiliated with the group less than five years ago shall not be taken into account.

CIGNA's argument that the Commissioner has interpreted S 1503(c)(2) too broadly focuses too narrowly on the short-term. Section 1503 only limits offsets forfive years following an acquisition. After that time, group insurance companies such as CIGNA can offset the losses of acquired companies as permitted, thereby effecting an increase in P&C capacity. There is no indication that Congress focused, in the final stages of enactment of the Tax Reform Act of 1976, on the situation of group companies acquiring group companies. Even if it had, there is even less reason to think that it would have been swayed by the potential short-term disadvantage to some companies. More likely is that Congress was interested in

21

the long-run solution. After all, it was Congress that imposed the five-year limitation in the first place.

Finally, CIGNA makes a policy argument that the INA companies should be permitted to offset losses against income because they had been permitted to do so before the acquisition. It contends that the Commissioner's regulation, as interpreted, is unfair because it requires that the income of profitable members of the acquired group be taken into account, but not the loss of acquired members. The simple answer, obviously unsatisfactory to CIGNA, is that the Commissioner, who has the delegated authority to promulgate legislative regulations, did not provide for initial offsets within the group. And there is no language in the statute that requires the offset CIGNA seeks. In fact, there was disagreement within the IRS as to whether the Commissioner could have provided for such initial offsets without contradicting the statute. Before us, the IRS continues to characterize that question as arguable. Inasmuch as the Commissioner did not adopt CIGNA's approach, the issue is not before us and we make no comment.

We do note, however, that if CIGNA's approach were adopted, it would create a distinction between nonlife companies acquired as a group and those very same companies acquired individually that is hard to justify. Had CIGNA acquired only INA's profitable nonlife companies in 1981, there is no question that the acquisition would have increased its overall taxable income. And, as CIGNA presumably concedes, had CIGNA subsequently acquired the remainder of the INA Group, S 1503(c)(2) would have precluded offsetting that increase in taxable income with the losses of the later-acquired members. CIGNA has offered no justification for requiring the Commissioner to treat the instant case differently, merely because both acquisitions occurred on the same day.

The overriding determinant is that the Commissioner's regulation is authorized by the statute, and his interpretation of that regulation is not so unreasonable as to be declared invalid by this court on policy grounds. That is not our function or our decision. As the Supreme Court has emphasized, "[w]hen Congress . . . has delegated

22

policymaking authority to an administrative agency, the
extent of judicial review of the agency's policy
determinations is limited." Pauley v. BethEnergy Mines, Inc.,
501 U.S. 680, 696 (1991).

III.

CONCLUSION

For the reasons set forth, we agree with the Tax Court,
and will affirm its judgment.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

23